## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

```
UNITED STATES OF AMERICA        :
                  PLAINTIFF     :   CRIMINAL ACTION NO.
          VS.                   :   06-181-FJP-DLD-1
                                :   JANUARY 14, 2005
EARL HENRY LEET                 :
                  DEFENDANT     :   8:30 A.M.
```
================================================================

### TRANSCRIPT OF TESTIMONY OF JOSEPH CASTILLE
### EXCERPT FROM JURY TRIAL
### BEFORE THE HONORABLE FRANK J. POLOZOLA
### UNITED STATES DISTRICT JUDGE

================================================================

### A P P E A R A N C E S:

FOR THE UNITED STATES OF AMERICA:
    MARY PATRICIA JONES, ESQUIRE
    COREY R. AMUNDSON, ESQUIRE
    UNITED STATES ATTORNEY'S OFFICE
    MIDDLE DISTRICT OF LOUISIANA
    777 FLORIDA STREET, SUITE 208
    BATON ROUGE, LA 70801

FOR THE DEFENDANT EARL HENRY LEET:
    JOHN A. McLINDON, ESQUIRE
    RAINER, ANDING & McLINDON
    8480 BLUEBONNET BOULEVARD, SUITE D
    BATON ROUGE, LOUISIANA 70810

    TROY HUMPHREY, ESQUIRE

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
PRODUCED BY COMPUTER.

### REPORTED BY:  ESTELLA O. CHAMPION, CRR, RDR.

---

### UNITED STATES COURTHOUSE
### 777 FLORIDA STREET
### BATON ROUGE, LOUISIANA 70801
### (225) 389-3565

EXCERPT                                    1/14/2009

1                          INDEX

2                                              PAGE

3  TESTIMONY OF JOHN CASTILLE ............................... 3

4    DIRECT EXAMINATION BY MR. MCLINDON: .................... 3

5       WITNESS TENDERED AS AN EXPERT ...................... 6

6       WITNESS ACCEPTED AS AN EXPERT ...................... 6

7    CONTINUED DIRECT EXAMINATION BY MR. MCLINDON .......... 6

8    CROSS EXAMINATION BY MR. AMUNDSON: ................... 21

9    REDIRECT EXAMINATION BY MR. MCLINDON: ................ 49

10  COLLOQUY BETWEEN THE COURT AND THE WITNESS ............. 57

11  COURT REPORTER'S CERTIFICATE .......................... 61

12                        *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

1          *(Excerpt - Testimony of Joseph Castille)*

2          *(Jury present.)*

3          **MR. McLINDON:**  Your Honor, at this time the defense

4     would call Joseph Castille.

5          *WHEREUPON,* **JOSEPH CASTILLE**, *having been duly sworn,*

6          *testified as follows:*

7          **THE COURT:**  Sir, you may proceed.

8                        **DIRECT EXAMINATION**

9     BY MR. MCLINDON:

10    Q.   Mr. Castille, just for the record, would you say and spell

11    your last name, please.

12    A.   Castille, C-A-S-T-I-L-L-E.

13    Q.   Okay.  And let me ask you a couple of questions about your

14    background.  Let's start right now:  Tell me what you're doing

15    right now.  Have you just recently finished school somewhere?

16    A.   I just recently graduated from LSU Law School.

17    Q.   Okay.  And have you taken the bar exam yet?

18    A.   Not yet.  Take it in February.

19    Q.   What did you do before you went to law school?

20    A.   Before I went to law school, I worked at the Attorney

21    General's office in their high tech crime unit on the Internet

22    Crimes Against Children Task Force.

23    Q.   Okay.  And just so there's no confusion, the Attorney

24    General, that's for the State of Louisiana?

25    A.   The State of Louisiana, yes, Louisiana Department of

1  Justice.

2  **Q.**   Okay.  And what did you do there?

3  **A.**   I did primarily computer forensic work, but I did a little

4  bit of everything.  But computer forensic stuff was the main

5  thing I did.

6       But I also went along on execution of search warrants

7  whenever we had to seize electronic evidence or analyze

8  evidence in the field, that type of thing.  And they had me do

9  a lot of various technical -- anything that plugged into a

10 wall, if they couldn't figure how to work it, they would often

11 get me and --

12 **Q.**   Okay.  And how many years did you do that?

13 **A.**   Two.

14 **Q.**   Okay.  Did you ever serve in any other capacity in law

15 enforcement?

16 **A.**   Um, I was a reserve deputy sheriff with the East Baton

17 Rouge Parish Sheriff's Office, and I was also -- part of my

18 title for some of the time I was at the Louisiana Department of

19 Justice, I was a computer forensic examiner/special agent.

20 **Q.**   Where did you go to college?

21 **A.**   I went to Millsaps College in Jackson, Mississippi for my

22 undergrad and majored in computer science there, and then went

23 to law school at LSU.

24 **Q.**   You're from Baton Rouge originally?

25 **A.**   Yes.

1   Q.    Where did you go to high school?

2   A.    Catholic High.

3   Q.    Have you ever testified as an expert before?

4   A.    Yes, I have.

5   Q.    In federal court?

6   A.    Federal court in the Western District, and then in the

7   19th, in state court.

8   Q.    Okay.  You were qualified as an expert in computer

9   forensics?

10  A.    Yes.

11  Q.    Okay.  Have you testified for the prosecution before?

12  A.    Yes.

13  Q.    Okay.  Have you testified for defendants before?

14  A.    Yes.

15  Q.    Okay.  Have you attended seminars in your career?

16  A.    Yes.  I've been to a lot of training classes and seminars

17  on computer forensics and computer science-related topics.

18  Q.    Have you ever lectured or given presentations at seminars?

19  A.    Yes, I have.

20        When I was at the Attorney General's office, I would

21  assist in presentations to parents and teachers and schools and

22  whatnot on the dangers of internet crimes against children and

23  how they can protect their kids against them; also taught law

24  enforcement in various areas around the state how to

25  investigate these crimes.  And I've also spoken to some bar

1  associations, primarily criminal defense attorneys, both in

2  Louisiana and in Texas, on internet crimes against children,

3  computer forensics, and basically teaching them how to

4  understand the technical stuff.

5  **Q.**   Was the bulk of your work, when you were at the Attorney

6  General's office, was it child pornography?

7  **A.**   The grant that paid my salary specified that I was only to

8  work on internet crimes against children; so primarily, yes.

9          **MR. McLINDON:**   I tender Mr. Castille as an expert in

10  the field of computer forensics.

11         **MR. AMUNDSON:**   No objection, your Honor.

12         **THE COURT:**   All right.   The jury may consider the

13  testimony of the witness as an expert in the field tendered.

14      You may proceed, sir.

15  BY MR. MCLINDON:

16  **Q.**   Mr. Castille, can you tell us what you were provided to

17  look at in this case?

18  **A.**   Um, well, I've received a number of documents or whatever

19  that were produced by the FBI.   I also received a couple of CDs

20  with information that the FBI had pulled from the defendant's

21  computer in this case.

22  **Q.**   Okay.   And I'm not sure if you were in the courtroom when

23  you heard Agent Campbell testify; but she talked about how she

24  took an image of the hard drive of the computer.   Were you

25  provided with a copy of that image of the hard drive?

1   A.    No, I was not.

2   Q.    Were you able to look at it, though, at the FBI offices?

3   A.    I didn't look at an image.  I didn't do a forensic

4   examination of the computer in this case.  I reviewed the

5   materials they provided to me.

6   Q.    Okay.  Okay.  Were you able to determine -- let's go back

7   to a date -- back in 2001, September 4, 2001, do you remember

8   anything significant about that date?

9   A.    Yes.

10  Q.    What was that?

11  A.    On a computer, pretty much every file on a computer has

12  three different dates that are associated with it:  The date

13  the file was created, the date the file was last modified, and

14  the date the file was last accessed.

15      The creation date is the date that the file is actually

16  created on the computer.  It sets that date to whatever the

17  computer clock is at that time.

18      The modified date is whenever the file was last altered.

19      And then the last access date is the last date that that

20  file was opened, whether it's by a person using the computer or

21  a program or whatever.

22      On September 4 of 2001, there were approximately 2000 --

23  wait, not 2000, sorry -- 200 files that had been opened on this

24  particular computer on the fourth.

25  Q.    And do you remember September 4 as being the date that

1   Mr. Leet brought the computer?

2   **A.**    That's the date that I was told he brought the computer

3   in.  I wasn't there when he brought it in, so I can't --

4   **Q.**    Okay.  And on that date, 200 files were opened?

5   **A.**    Approximately 200, yes.

6   **Q.**    Now what does that mean, "opened"?

7   **A.**    Means either a program used those files or a user actually

8   went in and opened the files to -- like an image file, if you

9   double click on it and it opens to view it, it will change the

10  access date to that day.

11  **Q.**    Just generally, how long would it take to click on a file,

12  open it, look at it, close it?

13  **A.**    It depends on the program you're using and the method that

14  you're using to view the images.  But I would say a couple of

15  seconds or something to open a file.

16  **Q.**    Or could it depend on the user, whoever was looking at

17  those pictures, how long he looked at them?

18  **A.**    Yes.  I mean, if you look at -- I mean, if you want to sit

19  there and look at an image for five minutes, you can.

20  **Q.**    Okay.  Were you in the courtroom when Matt Landry, the

21  technician, testified?

22  **A.**    Yes.

23  **Q.**    Okay.  He testified that he thought he looked at about

24  five, maybe ten on that.  Is that consistent with what you

25  found in your examination?

1  A.    Not at all.

2  Q.    Not even close?

3  A.    No.

4        Out of the roughly 200 files that were accessed on that

5  date, approximately 190 of them were image or movie files,

6  which suggests to me that someone sat there and looked through

7  around 200 pictures or movies, and they all seemed to be in the

8  same folder.  I think he was probably looking through all the

9  porn on the computer.

10  Q.    Now, did you hear his testimony about the monitor work?

11  It was checked in because the video wasn't working.  Did you

12  hear his testimony that, when he turned on the monitor, it

13  worked fine?

14  A.    Yes.

15  Q.    Was there anything more that he did or shouldn't have done

16  as long as the monitor was working?

17  A.    Well, I mean, opening an image doesn't -- I mean, you can

18  open an image to see if the image comes up clearly.  But if the

19  monitor is working, you can see it, and -- I mean, it's like a

20  TV.  If you turn it on and there's a picture, well, it's

21  working.

22        You can test out the video card or whatever, but you don't

23  do that by opening a bunch of images.  You do that by changing

24  the screen size and such within the computer configuration to

25  see if it will display different numbers of colors and

1    different sizes, and that's how you would test out the video

2    card or the monitor to see if it's working properly.

3              MR. AMUNDSON:   Your Honor, at this point I would

4    object.

5         There has been notice given of certain fields or certain

6    types of testimony that this witness will be providing.  We're

7    getting well outside the scope of that notice.

8              THE COURT:   Okay.  If it is, then he has to testify

9    as a layperson, and then you can only ask direct questions.

10             MR. McLINDON:   Yes, sir.

11             THE COURT:   And let's don't get outside --

12             MR. McLINDON:   I won't.

13             THE COURT:   -- because then, you know, there's a

14   problem.  I can only tell if there's an objection.

15             MR. McLINDON:   Yes, sir.

16             THE COURT:   It seemed to me, though, we were going

17   out --

18             MR. McLINDON:   Yes, sir.

19             THE COURT:   -- outside of what I thought he was going

20   to testify to.

21   BY MR. McLINDON:

22   Q.   Did you hear or were aware of the search warrant executed

23   on September 20 by Agent Burton?

24   A.   Yes.

25   Q.   Okay.  The manner in which he carried out that search

1  warrant, was that proper computer forensics?

2  **A.**    Not at all.

3  **Q.**    Okay.  Tell us what he did wrong.

4  **A.**    The number one rule in computer forensics is do not alter

5  the evidence.  Any training class you go to on computer

6  forensics, whether it's National White Collar Crime Center, or

7  Guidance Software, or FTK or whatever, the first thing they

8  tell you is to preserve the integrity of the evidence.  And the

9  simple act of turning a computer on writes to hundreds of

10  files, spoils the evidence, can potentially overwrite evidence,

11  both inculpatory and exculpatory.

12      So the one rule that pretty much every agency and every

13  course on computer forensics teaches you is that you do not

14  access a hard drive without a write blocker in place.

15  **Q.**    Well, did you ever execute search warrants when you were

16  at the Attorney General's office?

17  **A.**    Yes.

18  **Q.**    Did you ever go to a scene and have to search a computer

19  on the scene?

20  **A.**    Yes, I did.

21  **Q.**    Can you bring a write blocker with you?

22  **A.**    Yes.  And we did on a regular basis.  We would frequently

23  bring a set of write blockers.  In case one of them didn't

24  work, we could use the other one or whatever.  And we never

25  accessed a hard drive without plugging it into a write blocker

1   first.

2   Q.    How about big is a write blocker?

3   A.    It's about -- it's smaller than a paperback novel.  I

4   mean, they are tiny.

5   Q.    You can bring that to the scene where the search is going

6   to take place and plug it in?

7   A.    Yes.  And we did -- in the vast majority of searches we

8   conducted, we would bring a laptop and a write blocker.  And

9   after we secured the computer and the residence and everything,

10  we would unplug the hard drive and plug the write blocker into

11  the hard drive and read -- you can't conduct a full forensic

12  exam on scene because it just takes a long period of time to do

13  that --

14  Q.    Right.

15  A.    -- but you can scroll through the images or whatever.  And

16  one of the things we would do is scroll through all the images

17  and movie files on the computer, just to make sure that there

18  was something on there that corresponded with whatever our

19  warrant said we were to search for.

20  Q.    And when you did it that way, you didn't alter or spoil

21  any evidence?

22  A.    No.  A write blocker is a device that prevents anything

23  from being written to the hard drive and keeps anything from

24  being overwritten.

25  Q.    Did the Attorney General's office have write blockers?

1   A.    Uh-huh.

2   Q.    Okay.  We've had some testimony about bios dates.  Can you

3   tell the jury in your own words what a bios date is.

4   A.    Every computer has a clock that keeps track of time, and

5   "bios" stands for Basic Input Output System.  But essentially

6   the bios date is how the computer sets the dates and times of

7   all the files.

8         Whenever you create a file, the computer checks to see

9   what the bios date is, and it assigns that date to the file

10  when it gets created.

11        If you edit a file and save it, it will check the bios

12  date and set that; and typically it saves the time, along with

13  the date.  But any dates that you find on the computer

14  associated with the files for the most part are going to be

15  dates that were pulled from the bios at the time each of those

16  activities were conducted.

17  Q.    So if the bios date is wrong, would the creation date

18  necessarily be wrong or off?

19  A.    If the bios date was wrong at the time that the file was

20  created, yes.

21  Q.    Okay.  What about modified or last accessed?

22  A.    The same is true.  If the bios clock is off at the time

23  that a file is modified or at the time a file is accessed, it's

24  going to be saved as the incorrect time.

25  Q.    What do you know about the bios dates on this computer?

1  A.    Um, in one of the reports it said that they were unable to

2  obtain the bios date because the computer wasn't working, in

3  working order.

4  Q.    So we don't know if the bios dates were good or not?

5  A.    Well, I mean, you never know if a file date is correct if

6  it was something that you weren't sitting there in front of it

7  when it happened.

8       I mean, I've seen cases where people will open up their

9  clock and they will want to see what day of the week a certain

10  date fell on two years back or two years in the future, and

11  they will scroll forward to that date and they will -- instead

12  of clicking cancel, they will click okay, and that will change

13  their computer clock.  So anything they do between then and the

14  time that the computer clock gets set back to the correct time,

15  if they ever set it back to the correct time, those dates are

16  going to be off by however many days the bios or the computer

17  clock is off.

18  Q.    Go back to something.  It's a little bit out of order.

19       Back to the September 4th at Gateway where the 200 files

20  were open, you have no idea who did that, do you?

21  A.    No, I don't.

22  Q.    Okay.  In your analysis, can you tell me where these

23  pictures were found on this computer?

24  A.    They were located on the root of the C drive in a

25  folder -- and the root is just the lowest level -- but on the

1    C drive, in a folder called Rapido, and then within that

2    folder, a folder called My Documents.

3    **Q.**    Okay.  And can you tell me quickly how you would get to

4    that?

5    **A.**    The only way to get to that is to go into Windows

6    Explorer, which you could do from the Start menu, if you locate

7    Windows Explorer on there; or you can right click on the Start

8    button and click Explorer, or Explore All Users.  And then you

9    would have to navigate to the C drive, open up the C drive, and

10   then find the Rapido folder, open the Rapido folder.  And then,

11   within the Rapido folder, there was a My Documents folder,

12   which is not the same as the regular My Documents folder.  But

13   you would then open the My Documents folder there and --

14   **Q.**    That's where they were?

15   **A.**    What?

16   **Q.**    That's where those pictures were found?

17   **A.**    In there and in some of the folders under that.

18   **Q.**    And you may have answered my next question.  The My

19   Documents that I think we're all familiar with that appears --

20   when you turn your computer on, the desktop, there's a little

21   file or icon that says My Documents.  Is that different than

22   the My Documents you found buried in the C drive?

23   **A.**    Yes, it is.  The standard My Documents folder in Windows

24   98, which is the operating system in this case, is C:\My

25   Documents.  It's not C:\Rapido\My Documents.  And so it's a

1  completely different folder.

2       And I did check in this case, and there is a C:\My

3  Documents folder.  So the one on the desktop did point to that

4  one.

5  Q.   So if a person used his computer strictly just to send and

6  receive e-mail or just to browse the internet, he would never

7  have any reason to go look at his C drive, would he?

8  A.   No.

9  Q.   That's not a requirement?

10       I understand the C drive is running in the background.

11  But it's not a requirement that you go look at the contents of

12  the C drive to send and receive e-mail?

13  A.   Most people don't access the C drive because it's just --

14  there's not a lot of reason to, and it's full of hundreds of

15  thousands of files that don't necessarily -- they are not

16  anything that the average user needs to access or know about.

17  Q.   Did you find a firewall on this computer?

18  A.   I never saw the actual computer, so I can't…

19  Q.   Okay.  Okay.

20       Can you tell us briefly what a virus is?

21  A.   A virus, by definition, is any -- it's any program that

22  replicates itself and typically that spreads from one computer

23  to other computers.

24  Q.   What are some things that viruses can do?

25  A.   Just about anything that a regular program or person using

1  a computer can do a virus can do.

2      I mean, computers, by definition, are designed to run

3  programs, and a virus is just a program.  It happens to be a

4  malicious program that is designed to cause problems; but, like

5  any other program, it just runs and does what it thinks it's

6  supposed to do.

7      Viruses can allow people to take over a computer, to hack

8  into it.  They can delete files.  They can send out mass

9  e-mails.  They can set up your computer as a zombie computer,

10  so that people can use it later to shut down web sites or

11  whatever, or use it to hack into a third computer.

12      I mean, if you can imagine a program that can do

13  something, a virus can probably do that as well.

14  **Q.**  We heard some testimony earlier about either Bookmarks or

15  Favorites.

16  **A.**  Uh-huh.

17  **Q.**  And just can you tell us what that is again?

18  **A.**  Bookmarks are, in a particular web browser -- and there

19  are different web browsers, and different people use different

20  browsers -- but they're essentially -- the browser will keep a

21  list of recently -- well, not recently accessed -- but favorite

22  web sites or web sites that the user might want to go back to

23  later.

24      Not everybody uses bookmarks.  I don't just because they

25  tend to get cluttered up and I wind up with 300 bookmarks.  And

1   if I want to find something, it's easier for me just to type it

2   into a search engine and find it that way.

3   Q.    Can viruses have impact or affect bookmarks?

4   A.    Viruses and ad ware and other mal-ware -- mal-ware is a

5   generic term for any malicious program or program that the user

6   didn't authorize to run on their machine -- they can add

7   bookmarks, they can change your home page.  They can do a lot

8   of things.  But yes, it is possible for a virus or some sort of

9   mal-ware program to add bookmarks.

10  Q.    So a virus sent from a third person's computer from a

11  remote location can add a bookmark to your computer?

12  A.    Uh-huh.

13  Q.    Do you know if there were any viruses found on this

14  computer?

15  A.    Yes, there were.

16  Q.    Okay.  In fact, was there a virus --

17        You were given a disk by the FBI; is that right?

18  A.    That's correct.

19  Q.    Was there any problems with that disk?

20  A.    It was infected with virus.

21  Q.    Okay.  It is it possible that someone from a remote

22  location --

23        **MR. AMUNDSON:**  Your Honor, he has been going through

24  virus testimony, all of which is outside the scope of the

25  notice.

1      THE COURT:   Objection sustained.

2  BY MR. MCLINDON:

3  Q.   Can a person from a remote location download child

4  pornography onto another person's computer?

5  A.   Yes.

6      MR. AMUNDSON:   Again, outside the scope of his

7  notice, your Honor.  He has not provided notice as to any of

8  this line of questioning.

9      MR. McLINDON:   Well, then, I need to look at my

10  summary.

11      THE COURT:   Excuse me, gentlemen.  Everybody face me.

12  What did I say before the trial began?  Make an objection.

13  Go to the podium and present your argument.

14  Not there, at the podium.

15      MR. AMUNDSON:   Yes, sir.

16  Your Honor, the testimony of this witness as to viruses

17  was not provided in notice.  And we've heard a lot of it and

18  we're sort of letting it go.

19      THE COURT:   Was it included in his report?

20      MR. AMUNDSON:   It was not.  There has been no report.

21  There has been a summary of testimony provided and his CV has

22  been provided.

23      THE COURT:   Under the rule?

24      MR. AMUNDSON:   It was not included in his summary.

25      THE COURT:   Do you agree with that?

1       **MR. McLINDON:**  Well, I sent a summary, and then

2   Ms. Jones asked me for an update, and I e-mailed an update to

3   her of that summary.

4       **THE COURT:**  Did it include testimony regarding

5   viruses being able to be used to put pornography on another

6   person's computer?

7       If it isn't -- I mean, we will just be honest with each

8   other.  If it's there, you can continue.  If it's not, you're

9   an officer of the Court and you can't.

10      **MR. McLINDON:**  I would like the opportunity to review

11  it, if I could.  I felt certain that I put that.  I tried to be

12  as broad as I could in everything I covered.

13      **THE COURT:**  Do you have your copy?

14      **MR. McLINDON:**  I have my first copy, and then I can

15  pull up my amended copy.

16      **THE COURT:**  Well, let's pull it up.

17      **MR. McLINDON:**  I will read my first one.

18      **THE COURT:**  Wait, wait.  No.  We don't do that.

19      **MR. McLINDON:**  Pull up my other one?

20      **THE COURT:**  Pull up the other one.  If it's not in

21  the first one, let's see if it's in the other.  If it's in the

22  other -- if we have a copy, the two of you share.

23      **MR. McLINDON:**  Is that it, Corey?

24      **THE COURT:**  And then let me read it.

25      **MR. McLINDON:**  Your Honor, I did not specifically use

1   the word "viruses."  I put accessing web sites, downloading

2   files and storing files, among other things.

3        Having said that, I won't ask any more questions about

4   viruses.

5            THE COURT:  Okay.  That's appropriate.

6   BY MR. MCLINDON:

7   Q.   Can a person from a remote location download pornography

8   to another person's computer?

9   A.   Yes, they can.

10  Q.   If a computer just sat on a shelf for two or more years

11  without being powered up, would that have any effect on it?

12  A.    If there's no power going to it, the battery that keeps

13  the bios, the computer clock up to date, over a two-year period

14  of time, that battery would probably die and it would probably

15  clear any date that was stored in the computer.  And so the

16  next time you powered on the computer, it would probably reset

17  to 1/1/1980, which is the date that most computers are I

18  believe set to when their clock has been cleared or the battery

19  has died.

20            MR. McLINDON:  Thank you, Mr. Castille.

21                    CROSS EXAMINATION

22  BY MR. AMUNDSON:

23  Q.   Good afternoon, Mr. Castille.

24  A.   Hello.

25  Q.   My name is Corey Amundson.  I'm an Assistant United States

1    Attorney.  I just have a few questions to ask you today about
2    this case.
3        You haven't done a forensic examination of the hard drive
4    that we're talking about, have you?
5    A.   No, I have not.
6    Q.   Is that something you would have liked to have done?
7    A.   Yes.
8    Q.   That would be a thorough thing to do?
9    A.   Yes, but also very expensive.
10   Q.   And so that wasn't done in this case by you?
11   A.   No.
12   Q.   But that was done by the FBI?
13   A.   I believe so, yes.
14   Q.   And are you familiar with the FBI agents that testified as
15   expert witnesses in this case?
16   A.   I met -- Well, I know Larry Jones, but I don't know if he
17   testified or not.  But I don't think I've met any of the ones
18   that testified today before to my knowledge.
19   Q.   Special Agent Tedder and Special Agent Terri Campbell?
20   A.   I've heard Terri Campbell's name a lot, but I haven't met
21   her.
22   Q.   You mentioned that the files have different names or
23   different dates associated with them; is that correct?
24   A.   Uh-huh.
25   Q.   That there is an access date, a modified date, and a

1    created date associated with each file; is that correct?

2    A.    Uh-huh.

3    Q.    And you said that the access date was something that would

4    be changed if that image was accessed.  Is that fair to say?

5    A.    That's fair to say.

6    Q.    You used the word "opened" sometimes.

7    A.    Well, opened or accessed.  I mean, different programs --

8    an antivirus program, if you tell it to scan a particular

9    folder, it will access all the files in that folder, but they

10   won't necessarily pop up on the screen where you can view them.

11   Q.    Okay.  So there are things that change access dates beyond

12   the opening of an image?

13   A.    Yes.

14   Q.    And those things involve a program like you just

15   described; is that correct?

16   A.    That's correct.

17   Q.    And are you familiar with thumbnails?

18   A.    Yes.

19   Q.    And thumbnails are essentially a preview of an image; is

20   that correct?

21   A.    That's correct.

22   Q.    So if you were looking for images, you might open a series

23   of thumbnails to find an image, and then click on a particular

24   image and open it up?  Is that fair to say?

25   A.    Yes.

1   Q.   And you may have hundreds of thumbnails up on a screen and

2   choose to open a couple of thumbnails; is that correct?

3   A.   That's correct.  But the images that I was referring to

4   were not -- most of them were not thumbnails.

5   Q.   The question I asked you is:  If you have a series of

6   thumbnails, maybe hundreds on a computer, and you click on a

7   thumbnail to open it up, that's a way to find images; is that

8   correct?

9   A.   Yes, that would access that image, yes.

10  Q.   So the hundreds of thumbnails that you had put up there

11  would suddenly have different access dates; is that correct?

12  A.   If the thumbnails were saved in different files, yes.

13  Q.   And so you wouldn't have actually opened the thumbnails at

14  that point in the sense that we all think of opening an

15  image --

16  A.   Well --

17  Q.   -- is that correct?

18  A.   It's important to distinguish the thumbnail file from the

19  image file.

20      Thumbnail files can be created in different ways and

21  sometimes they are stored internally within a program, and they

22  are not necessarily accessed to get a thumbnail view in Windows

23  Explorer.  So it wouldn't necessarily change the access date.

24  Q.   Might it?

25  A.   It might, but it didn't in this case because, if it had,

1    then all of the files in that folder would have had -- that

2    were images would have had access dates from that date, and

3    they didn't all have.

4    Q.    If every single file had been opened in thumbnail; is that

5    correct?

6    A.    Well, when you open a folder --

7    Q.    Is that correct?

8          THE COURT:  Let me say something:  If the attorney

9    asks you a question that calls for a yes or no answer, you have

10   to answer yes or no, then you can explain.

11         THE WITNESS:  Okay.

12         THE COURT:  Could be on the bar exam.

13         THE WITNESS:  Okay.  Yes.  Yes, your Honor.

14   Can you say that again?

15   BY MR. AMUNDSON:

16   Q.    Certainly.

17        If you have a series of thumbnails -- and we'll just sort

18   of start over, because I think we got off track here.

19        If you have a series of thumbnails up on a screen, okay?

20   Let's say hundreds, let's say 200, and you're looking for

21   images to open, would the fact that you've got these 200

22   thumbnails up on the screen, could they cause those access

23   dates to change because of that?

24   A.    The thumbnail access dates or the image access dates?

25   Q.    The thumbnail access dates.

1   A.    Yes.

2   Q.    Or the image access dates.

3   A.    The image access dates possibly, but it depends on the

4   program that the thumbnails are being displayed in.

5   Q.    Okay.  And so when you say -- and you said a couple of

6   times during your direct that the access date is the date that

7   it opened.  That's not accurate, is it?

8   A.    Well, I said "opened" or "accessed."  I apologize if I

9   said "opened."

10  Q.    Because opened, that's not accurate at all; is that

11  correct?  To say that an access date only changes when the file

12  is opened?

13  A.    Not only when it's opened, no, but opened or accessed --

14  well, opened -- not necessarily opened in the sense that you

15  can view it, but another program can open it to -- I mean, when

16  a program is accessing another file, it's opening a file.  It

17  may not be displaying it on the screen, but it's still being

18  opened; it's just not opened in the way that a user can view

19  it.

20  Q.    And not only do thumbnails, the previewing of a file,

21  cause the access date to change, but other things, like

22  programs, the running of the program might cause an access date

23  to change, like you talked about, the Norton Antivirus.  Is

24  that correct?

25  A.    That is correct.

1   Q.    And there are other programs running on a computer that

2   might change an access date; is that correct?

3   A.    That is correct, yes.

4   Q.    And such programs may well have started when a repairman

5   at a store boots up a computer to work on it; isn't that

6   correct?

7   A.    It's possible, but unlikely that it would have scanned

8   image files.

9   Q.    But it's possible?

10  A.    It is possible if the repairman changed the default

11  settings to tell it to scan images.

12  Q.    So when you testified that there were over 200 files

13  opened on September 4, 2001, because the access date changed,

14  that's not correct.  You can't say that, can you, with

15  certainty?

16  A.    Yes -- well, assuming the computer clock was set right at

17  that time, I can say that they were opened.  I can't say

18  whether a person opened them or another program opened them,

19  but they were opened.

20  Q.    Okay.  This bios clock issue that you talked about, you're

21  suggesting that because the bios clock is off, that the dates

22  in the computer may somehow be inaccurate?  Is that fair to

23  say?

24  A.    If the bios clock is off when the dates are set, then yes,

25  the dates are going to be inaccurate.

1   Q.    The fact that, you know, your other line of testimony

2   concerning, you know, what happened on September 4th, 2001,

3   that was based on the dates in the computer; right?

4   A.    Yes.

5   Q.    So you were assuming that those dates were accurate for

6   the purposes of that testimony; is that fair to say?

7   A.    Yes, that's fair to say.

8   Q.    And so now you're saying, well, the bios clock, because it

9   was broken, we can't rely on any of that information, any of

10  those dates?

11  A.    Well, I don't know that the bios clock was broken.  But in

12  one of the reports that I read said that it was.  But yes, I

13  would assume that the bios clock was accurate on the fourth and

14  the 20th as those accesses match up with the dates in the

15  reports.

16  Q.    So the fact that we couldn't access the bios clock doesn't

17  mean that the times and dates were necessarily inaccurate, does

18  it?

19  A.    No, it doesn't.

20  Q.    Now, in this case, on the defendant's personal computer,

21  there was a shortcut on the icons to My Documents; is that

22  correct?

23  A.    Yes.

24  Q.    And not only was there a shortcut to My Documents that

25  went -- did that shortcut not go to Rapido?

1  A.    It went to the C:\My Documents folder, not the Rapido\My
2  Documents folder.

3  Q.    Are you sure?

4  A.    Yes.

5  Q.    You didn't do a forensic exam, though, did you?

6  A.    No.

7  Q.    Is it also true that My Documents Rapido, the Rapido file
8  was the default for downloads from the internet?

9  A.    With Internet Explorer, yes.

10 Q.    And somebody would have had to set that default; is that
11 correct, to Rapido?

12 A.    They would have had to save something there at one point
13 or another.  It's not -- you don't set it, per se.  But if you
14 save something to that folder, it remembers the last folder
15 where you saved something.

16 Q.    When you go and buy a Windows 98 computer, it doesn't come
17 with a Rapido file, does it?

18 A.    No.

19 Q.    You would have to create that?

20 A.    Yes.

21 Q.    You mentioned -- and you got in the area of viruses, and
22 you mentioned that there were viruses on this computer; is that
23 correct?

24 A.    That's correct.

25 Q.    Do you know what they did?

1   **A.**    Um, no.  And part of the reason is that antivirus

2   companies, their job is to detect viruses and remove them.

3   It's very easy to change what a virus does and have the

4   antivirus program still detect it as the same virus that it was

5   before; but you can change what the virus actually does, the

6   payload, so to speak.

7   **Q.**    So the answer is no, you don't know what the virus is

8   doing?

9   **A.**    No, I don't.

10  **Q.**    And do you know what the viruses were?

11  **A.**    There's a list of them, and then I found an additional one

12  on the CD the FBI gave me.

13  **Q.**    Have you researched --

14          **THE COURT:**  Wait, wait, wait.  Let him finish his

15  answer.

16          **MR. AMUNDSON:**  I'm sorry, your Honor.

17          **THE WITNESS:**  And it's also possible there were

18  additional viruses that aren't picked up by an antivirus

19  program.

20  **BY MR. AMUNDSON:**

21  **Q.**    Would you dispute the testimony of the sworn FBI examiners

22  that have said that the viruses that were found on this

23  computer wouldn't have any significant effect on any working of

24  the computer, and certainly wouldn't cause the downloading of

25  child pornography onto the computer?

1   A.    It would surprise me if they caused the downloading of

2   child pornography on a computer.  I haven't heard of a virus

3   that does that by itself.

4         I question how they would know that a -- what specifically

5   a virus does without running the virus and playing with it

6   and/or looking at the code within the virus to see what it

7   actually does.

8   Q.    You don't know what the viruses are, though, do you?

9   A.    I don't know.  I haven't looked at the code or --

10  Q.    Did you research --

11  A.    -- unencoded them.

12  Q.    Did you research the viruses?

13  A.    To be honest, I actually just saw the list of viruses

14  yesterday.  That was the first I had the list.  So no, I didn't

15  have a chance to do that.

16  Q.    So you haven't even researched what these viruses are?

17  A.    No.  But even researching it would not necessarily

18  indicate what they do.

19        As Norton and various companies typically will describe

20  what the virus they find does; and then every virus that

21  matches that signature that's close to that, they are going to

22  categorize as the same thing, even though some college student

23  has changed what the virus does.  So just having the name of

24  the virus doesn't indicate what the virus does.

25  Q.    Would the opening, or I should say would the powering up

1   of the computer by FBI Special Agent Harry Burton, when it was

2   not connected to any external devices, cause child pornography

3   to magically appear on that computer?

4   **A.**   I don't know anything about magic, so I would guess not.

5   **Q.**   Is that a "no"?

6   **A.**   I wouldn't think so, no.

7   **Q.**   You wouldn't think so?

8   **A.**   I mean, I can't think of any way that it would cause

9   virus -- that child porn to mysteriously appear on the computer

10  that wasn't there before.

11  **Q.**   You talked about viruses and you talked about bookmarks

12  and favorites.  You have no idea whether -- I mean, what these

13  viruses were capable of doing or not doing, much less whether

14  they had anything to do with the favorites that we talked

15  about; is that correct?

16          **MR. McLINDON:**   Objection, your Honor.

17          **THE COURT:**   Sustained.

18      We had an objection earlier that I ruled on, and you can

19  stay within that group if you rephrase your objection.  But you

20  made the objection earlier about being outside the scope.

21          **MR. AMUNDSON:**   Yes, sir and I agree.  I believe

22  Mr. Castille did briefly testify about --

23          **THE COURT:**   You can stay within the testimony that he

24  gave.

25          **MR. AMUNDSON:**   Yes, sir.

1   BY MR. AMUNDSON:

2   Q.   You worked at the Attorney General's office?

3   A.   Yes, sir.

4   Q.   For how long?

5   A.   Two years.

6   Q.   You were forensic examiner with them?

7   A.   Special agent, forensic examiner, yes.

8   Q.   You were suspended by the Attorney General's office while

9   you were working there, weren't you?

10  A.   Yes, I was.

11  Q.   And it was for falsifying time sheets, was it not?

12  A.   No.  That was the reason they gave.

13  Q.   They told you you were suspended because you had been

14  falsifying time sheets; is that correct?

15  A.   They --

16          THE COURT:  Excuse me.  Yes or no, and then you can

17  explain.

18          THE WITNESS:  Yes, but that was not the real reason I

19  was suspended.

20  BY MR. AMUNDSON:

21  Q.   And you -- in fact they suspended you, they told you

22  because you were repeatedly falsifying time sheets; not just

23  one time, but repeatedly; is that correct?

24  A.   No, that's not correct.

25  Q.   That's not correct?  It was just one time?

1  A.   Well, I disagree that what I was doing was falsifying time

2  sheets.  But the thing that they ultimately fired me for was --

3  Q.   Well, we'll get to your firing in a second.

4           THE COURT:  Wait, wait, wait.  Let him finish.

5           THE WITNESS:  The thing that I was ultimately fired

6  for was erasing the variance fields on my time sheets.

7  BY MR. AMUNDSON:

8  Q.   So that's why you were fired was for erasing the variance

9  fields?

10  A.   That's not why I was fired.  That was the reason they

11  gave.

12  Q.   Okay.  Did you alter -- let me make sure I have my

13  question correctly.

14       Isn't it true that you altered time sheets after the fact,

15  falsifying that you were present from 8:30 to five, and then

16  got caught?

17  A.   Um, I wrote down 8:30 to five as the hours --

18  Q.   Is that true or not?

19  A.   Yes.  I wrote down 8:30 to five --

20  Q.   It's a yes or no question.

21           THE COURT:  He said yes, but now he's trying to

22  explain.

23           THE WITNESS:  The entire time I worked there, I put

24  down 8:30 to five as the hours I worked because they -- for one

25  thing, it was easier; and I was a salaried employee, I was paid

1   a certain amount.  It wasn't hourly.  I averaged well over 40

2   hours the entire time I was there.

3        They came up with a policy that, if I was 15 minutes --

4   any more than 15 minutes late in the morning, they wanted me to

5   fill out a leave slip.  And if I stayed past five on any day, I

6   had to fill out an overtime slip.

7        The nature of the work was such that, I mean, crimes

8   against children, children are typically home from 2:30 in the

9   afternoon until late at night.  And so, because of that, and we

10  were doing online undercover stuff and because we were

11  traveling around the state, it was rare that 8:30 to five were

12  the hours I actually worked.  I just didn't want to fool with

13  the additional red tape of having to fill out leave slips and

14  overtime slips every day.

15  Q.   But you did put 8:30 to five?

16  A.   Yes, I did.

17  Q.   And that's not when you worked; is that correct?

18  A.   That's correct.

19  Q.   And that was multiple occasions?

20  A.   I did that from the time I started until the time I left.

21  Q.   So when earlier you testified that it was only one time,

22  that was not true?

23  A.   Well, initially that's what I was told to do was to put

24  8:30 to five every day.

25  Q.   But you --

1    A.    When they first hired me, I was instructed to do that.

2    Q.    So when you said, "I only falsified it one time," what one

3    time were you talking about?

4    A.    When I erased edit variance fields from the time sheet,

5    because they seemed to think that the edit variance fields were

6    significant.

7    Q.    So you were kind of trying to cover your tracks?

8    A.    I was erasing numbers that didn't mean anything off the

9    time sheet.

10   Q.    You were trying to cover your tracks?

11   A.    I wouldn't phrase it that way.

12   Q.    What were you trying to do?

13   A.    Avoid unnecessary red tape --

14   Q.    Avoid detection?

15           THE COURT:  Excuse me.  Let him finish.

16           MR. AMUNDSON:  I'm sorry, your Honor.  I apologize.

17           THE WITNESS:  I was more concerned with getting my

18   job done than I was with filling out leave slips and overtime

19   slips when they knew I was working more than 40 hours a week,

20   and I was a salaried employee, and it didn't matter how many

21   hours -- when I came in and when I left, as long as I completed

22   the job.

23   BY MR. AMUNDSON:

24   Q.    So your testimony here today is that the reason you

25   falsified these documents on all these many occasions is

1  because you were just working a different set of hours?

2  A.  That's correct.

3  Q.  Do you recall testifying in federal court in Lafayette,

4  Louisiana?

5  A.  Yes.

6  Q.  Do you remember testifying before the Federal District

7  Judge Richard T. Haik in that case?

8  A.  Yes.

9  Q.  And you were testifying on behalf of the defendant in that

10  case?

11  A.  Yes.

12  Q.  And that was a child pornography case, too, wasn't it?

13  A.  It was --

14  Q.  Sexual exploitation of children?

15  A.  It was some kind of crime, internet crimes against

16  children.

17  Q.  Do you recall being asked questions about your

18  falsification of time sheets in that trial?

19  A.  Yes.

20  Q.  And do you recall what your answers were?

21  A.  No, I don't.

22  Q.  Let me refresh your memory.

23      In response to the question:  "So you altered the amount

24  of time that the computer showed that you were at work?"

25      Answer:  "No, I -- the times that I was signing in, I

1  signed in at 8:30 every day and out at five every day.  And

2  sometimes, if I forgot to sign in when I got there in the

3  morning, I could go back and type in 8:30, but it would keep a

4  difference of the amount of time between when I remembered to

5  sign in and when I actually got there."

6       Do you remember testifying under oath in federal court to

7  that?

8  A.   Yes.

9  Q.   And that explanation of why you were falsifying the time

10 sheets is suggesting somehow that you did work 8:30 to five,

11 but you had just forgotten to sign in on a couple of days when

12 you got in, and so you later went back and made the correction;

13 isn't that true?

14 A.   That particular week, yes.  But for the most part, it was

15 rare that I worked 8:30 to five.

16 Q.   So your explanation today is different than your

17 explanation to Judge Haik during that trial; is it not, and

18 that jury?

19 A.   I don't think it's different.  I mean, I was referring to

20 the particular week that they fired me based on.

21 Q.   So that week you were coming in at 8:30 and then

22 forgetting to sign in and went back?

23 A.   Because they were having a fit about the time sheet issue,

24 and so I said, okay, fine, I'll work 8:30 to five.  And I would

25 forget to sign in or forget to sign out.  And if I worked until

1  eight at night and then went back and changed it from eight at

2  night until 5:00 p.m., it would reflect a difference of that

3  number of hours and add it to the variance.

4       But the real reason I was fired is that --

5            MR. AMUNDSON:  I think this is beyond the scope of my

6  question, your Honor, about the firing.  We'll get to the

7  firing.

8            THE COURT:  Well, go ahead.  Let's get to it.

9  BY MR. AMUNDSON:

10  Q.    Before we get to the firing, I just have a couple more

11  questions as to your suspension.

12       And you were suspended; is that correct?

13  A.    Yes.

14  Q.    You're in law school now or graduated?

15  A.    I've graduated.

16  Q.    And you've applied to the bar?

17  A.    Yes.

18  Q.    And at this point you've applied two different times; is

19  that correct?

20  A.    No.

21  Q.    Did you submit two different applications?

22  A.    Yes.  But the first one was not completed.

23  Q.    Did you submit to the bar or to the National Conference of

24  Bar Examiners two different applications?

25  A.    Yes, I thought I did.  The first time they told me that it

1    was not complete, and so I don't know if that counts as

2    submitting the full -- I didn't submit the full application.

3    Q.    Did you submit a full application to the bar in December

4    of 2008, last month?

5    A.    Yes.

6    Q.    And when you submit an application to the bar, is that a

7    serious thing?

8    A.    Yes.

9    Q.    And the questions and answers that you put on a bar

10   application, are those serious matters?

11   A.    Yes.

12   Q.    And they require your candor and your honesty; is that

13   fair to say?

14   A.    Yes.

15   Q.    Because that has to go to whether or not you're going to

16   be admitted as an attorney in this state; is that right?

17   A.    Uh-huh.   Uh-huh.

18   Q.    Do you recall on the December 2008 bar application that

19   you completed the following question:   "Have you ever been

20   terminated, suspended, disciplined or permitted to resign in

21   lieu of termination from any job?"

22         Do you recall that question?

23   A.    Uh-huh.

24   Q.    And you said yes; is that right?

25   A.    Yes, I believe so.

1   Q.    And you checked that you were terminated; is that correct?

2   A.    Uh-huh.

3   Q.    And then it asks for an explanation of the circumstances;

4   right?

5   A.    Uh-huh.

6   Q.    And you didn't check that you were suspended, did you?

7   You didn't mention that in the check box on the application?

8   A.    It was all part of one thing.  I mean, I was fired because

9   they suspended me without pay and then asked me to work without

10  pay while I was suspended.

11  Q.    And then there's a space on here, Explanation of

12  Circumstances; do you recall that?

13  A.    Yes.

14  Q.    Do you recall what you said?

15  A.    No.  I tried to type in a lengthy explanation, but it was

16  only -- I could only fit in like a hundred characters or

17  something into the field, and so I couldn't give a full

18  explanation.

19  Q.    Well, let me refresh your memory on what you wrote down to

20  the bar examiners about this termination.

21        "I called attention to the fact that my supervisor was

22  asking me to violate the terms of a federal grant.  I was

23  suspended and later terminated."

24  A.    Uh-huh.

25  Q.    Does that refresh your memory?

1   A.    Yes.

2   Q.    That's not what you told us earlier about why you got

3   fired.  Didn't you testify that you got fired because you had

4   erased information in the time sheet database?

5   A.    No.  I said that was the reason they gave for firing me.

6   Q.    Well, why did they fire you?

7   A.    Because I was working on a federal grant that specified

8   that I was only to work on internet crimes against children.

9   My salary was paid a hundred percent with that money.

10        They started -- the administration started asking us to

11  work on things that were not related to crimes against

12  children, CD -- people mass producing and selling CDs and that

13  sort of thing.  A coworker of mine and I went to them and said

14  We're not supposed to be working on this.  This is against the

15  terms of the grant.  He was suspended and later resigned as a

16  result.

17        They sent out an e-mail saying that we were no longer to

18  work on anything that wasn't an internet crime against

19  children.  The following week they continued asking us to work

20  on things that didn't relate to crimes against children.

21        They had me do surveillance on a boxing match.  And the

22  head of the investigation division at the Attorney General's

23  office at the time was a boxing promoter.  And I felt like I

24  was:  A, violating the terms of the grant and federal law; and

25  B, that I was not doing what I wanted to do, which was to

1  protect children.  And I again brought their attention to this,

2  and they were not happy about it.  So they suspended me based

3  on the time sheet thing; which I might also add, the majority

4  of my coworkers were also writing down 8:30 to five because

5  that's what we had been instructed to do.

6  Q.   That's a very lengthy explanation.  Is that the same

7  explanation you gave to the bar exam when you submitted your

8  application in January of 2007, or is that different?

9           MR. McLINDON:   Asked and answered already, your

10 Honor.

11          MR. AMUNDSON:   Different application, your Honor.

12          THE COURT:   Different application.

13          MR. McLINDON:   Oh, I'm sorry.

14          THE WITNESS:   I don't recall.

15 BY MR. AMUNDSON:

16 Q.   Let me refresh your memory on what you told the bar

17 examination -- bar examiners in January of 2007 about why you

18 were fired.

19      "I was fired when my supervisor found out I was leaving

20 for law school, possibly for political reasons."

21      Do you recall that?

22 A.   Yes.

23 Q.   Doesn't say anything about any federal grant in there,

24 does it?

25 A.   No.  But I learned additional information after that and

1  talked to some people that seemed fairly certain that the

2  whistle blower-type activity was why I was actually fired.

3       But at that time -- at the time I was fired, my father was

4  testifying in a case against the Attorney General's office

5  and -- I forgot.  What was the other part of that?

6       I told them I was leaving for law school anyway.

7  Q.   You were suggesting that you were fired because you were

8  leaving for law school and for political reasons to the bar

9  examiners in January of 2007.

10 A.   The law school was also part of it.  They essentially,

11 while I was suspended, told me to come in and work on a case

12 that I was working on with Steve Martin, and --

13           THE COURT:  Excuse me.

14      Make sure -- all the people have to pay attention.  I

15 don't know if you're sleeping or not sleeping.  Okay.  Pay

16 attention.

17           THE WITNESS:  I was working on a case, and they

18 had -- while I was suspended without pay, they had tried to get

19 somebody else to work the case, and they couldn't figure out

20 what needed to be done on it.  So they asked me to come back in

21 without pay.

22      I told them that I would be happy to finish the case if

23 they would remove the suspension from my record and allow me to

24 leave, allow me to resign, and told them that I was leaving for

25 law school anyway.  And they said no and fired me.

1     So, I mean --

2   BY MR. AMUNDSON:

3   Q.    Okay.

4   A.    -- I don't know the exact reason, but I suspect that it

5   was a combination of those things.

6   Q.    Any other reasons you want to throw out?

7   A.    No.  Just that I was leaving for law school, and that I

8   was pointing out that I was under the impression they were

9   violating federal law.

10  Q.    Did you report that to the FBI?

11  A.    No, I did not.

12  Q.    You didn't report that to my office, did you?

13  A.    No.  I was afraid that they were going to charge me with

14  some trumped up whatever.

15  Q.    Okay.

16  A.    I mean, they --

17  Q.    When did that fear go away and cause you to come up with

18  this explanation?

19  A.    Well, when Charles Foti was voted out of office and left,

20  if you want the honest -- I mean, that's the honest answer.

21  Q.    It sounds as though that experience has left you pretty

22  bitter.  Is that fair to say?

23  A.    Not bitter.  I mean, I have a lot of friends that work at

24  the Attorney General's office now.

25        I was terrified for a long time of the sort of things that

1   were going on in that office.  I mean, when I was fired,

2   they -- I took a box of my personal things out of the building,

3   and they threatened to charge me with breaking into my office

4   and stealing things from them.

5   Q.    So let me make sure I'm straight on all of this.  You did

6   falsify the time sheets, though; right?  Is that correct?

7   A.    I did alter some time sheets, yes.

8   Q.    Now, during this time that you're working at the Attorney

9   General's office, who was your supervisor?

10  A.    For most of the time, it was James Piker, and then it was

11  Clay Reeves.

12  Q.    When did that change occur?

13  A.    When Foti took over.  Well, sometime after Foti took over.

14  Q.    And when was that?

15  A.    I don't recall the exact date.

16  Q.    Who was your last supervisor?

17  A.    Um, at one point -- it changed almost on a weekly basis.

18  At some points I was told Toby Aguillard was over me.  At some

19  points I was told that Clay was over me.  At some points I was

20  told that Les Bonano was over me.

21  Q.    You didn't tell the bar examiners, when they asked you to

22  identify a supervisor, any of the supervisors that would have

23  had knowledge of your suspension and your firing; is that

24  correct?

25  A.    That's not correct.  James Piker knew all about my

1  suspension.

2  Q.   He wasn't there at the time, was he?

3  A.   No, but he is there now, and he worked with a lot of

4  people that were involved in it, and he knew the intimate

5  details of what was going on.

6  Q.   You didn't identify for the bar examiners any of the

7  supervisors that were involved in your firing or your

8  suspension; is that correct?

9  A.   I wasn't sure who to put for my supervisor because it

10 changed --

11         MR. AMUNDSON:  I think it's a yes or no answer, your

12 Honor.

13         THE WITNESS:  Okay.  Yes, I didn't put any of them

14 because none of them really supervised me, and I wasn't sure

15 who was actually above me.

16 BY MR. AMUNDSON:

17 Q.   How much are you getting paid in this case?

18 A.   I don't know.  I was appointed by the Court.

19 Q.   Have you gotten any of --

20         You were appointed by the Court?

21 A.   That's my understanding.  I mean, I don't know that he

22 appointed me, but --

23         THE COURT:  Oh, wait, I didn't appoint anybody.

24         MR. McLINDON:  He's appointed under the CJA Act,

25 Judge.

1        THE COURT:   The lawyer, the defendant's lawyer
2    requested expert fees and I approved them, but I didn't appoint
3    you.
4        MR. McLINDON:   Right.
5        THE WITNESS:   Okay.  I'm not sure exactly all the
6    details of how it was done.
7    BY MR. AMUNDSON:
8    Q.   Is a lot of your outside income nowadays coming from
9    testifying for defendants in sexual exploitation of children
10   cases?
11   A.   A fair amount.
12   Q.   And does the outcome of those cases reflect positively on
13   you?
14   A.   I don't know that it's positive or negative how the case
15   comes out, as long as I testify truthfully.
16   Q.   So you're saying that if you testified in a case and the
17   defendant got off, that that wouldn't make you look better?
18   A.   No.
19   Q.   You don't think that's true?
20   A.   I think my integrity is more important and that I don't --
21   Q.   I'm not asking about that.  I'm asking whether or not you
22   think that, if you testified in a case where the defendant got
23   off, that would make you look better professionally?
24   A.   To the defense attorneys, yes.  But I don't think it makes
25   me look better.

1    Q.    And, in fact, it's the defense attorneys that you're

2    marketing yourself to; is that correct?

3    A.    No.  Actually I've been trying to market myself to civil

4    attorneys, but most of the demand seems to be defense

5    attorneys.

6    Q.    You're not testifying on behalf of the United States in

7    any cases, are you?

8    A.    I would be happy to.

9    Q.    You're not doing that, are you?

10   A.    I haven't had the option.

11   Q.    Have you ever done that?

12   A.    Testified on behalf of the United States?

13           THE COURT:   Yes.  Asked and answered.

14           MR. McLINDON:   Asked and answered three times.

15           MR. AMUNDSON:   One moment, your Honor.

16   Nothing further, your Honor.

17           THE COURT:   Any redirect?

18           MR. McLINDON:   Yes, sir.

19                    REDIRECT EXAMINATION

20   BY MR. McLINDON:

21   Q.    Mr. Castille, let me start back with:  You were working

22   for the State Attorney General's office; is that right?

23   A.    Uh-huh, that's correct.

24   Q.    But your salary came from a federal grant?

25   A.    Yes.

1  Q.   So the feds gave some money to the State of Louisiana,
2  said, use this money to pay a computer expert to prosecute
3  child porn cases?
4  A.   Well, to investigate, not prosecute; but yes.
5  Q.   Investigate child porn cases.  And it was a salary?
6  A.   Uh-huh.
7  Q.   So if you worked from eight to five or if you worked from
8  eight to nine that night, you got the same salary?
9  A.   Correct.
10  Q.   Okay.  But somewhere along the line one of your
11  supervisors said:  Look, even though you're getting a salary,
12  you need to do time sheets.  And so you were instructed -- and
13  you told them, "Look, I'm a salaried employee."
14  A.   Uh-huh.
15  Q.   And so they said:  Well, just put 8:30 to five every day;
16  is that right?
17  A.   That's correct.
18  Q.   And you did that for a while, didn't you?
19  A.   Uh-huh.
20  Q.   Okay.  Now, was Charles Foti always your boss?
21  A.   No.
22  Q.   All right.  Who was the Attorney General before him?
23  A.   Richard Ieyoub.
24  Q.   Okay.  And then Richard Ieyoub didn't run and Charles Foti
25  got elected?

1  A.   Uh-huh.

2  Q.   And this is the same Charles Foti that prosecuted Dr. Anna

3  Pou in the Katrina cases, isn't it?

4       MR. AMUNDSON:   Objection, your Honor.

5       THE COURT:   Objection sustained.  Way, way far

6  removed.

7  BY MR. MCLINDON:

8  Q.   Who was Mr. Foti's -- Who is Les Bonano?

9       MR. AMUNDSON:   Your Honor, I think we're getting --

10  unless he can show --

11       THE COURT:   Well, you asked a lot of questions about

12  his getting suspended and what have you, and I think I need to

13  give counsel an opportunity to ask some questions.

14       MR. McLINDON:   And actually this was brought up on

15  cross-examination.

16       THE COURT:   Well, I've ruled in your favor.  So the

17  objection is overruled.

18  BY MR. MCLINDON:

19  Q.   Tell me look Les Bonano was.

20  A.   He was the head of the investigation division.  He was

21  also a boxing promoter who used to run the inmate boxing in the

22  Orleans Parish Prison.  He was denied a gaming license in

23  Louisiana several times for alleged mafia ties.

24  Q.   Okay.  But he was working for Charles Foti at the AG's

25  office?

1   A.   Yes.

2   Q.   Okay.  And what did Mr. Bonano asked you to do with the

3   boxing?  What did he ask you to do?

4   A.   He asked me to photograph and conduct surveillance on a

5   rival boxing promoter.

6   Q.   And did he -- go ahead.

7   A.   And we were told that -- we had a case involving the other

8   boxing promoter, but they wouldn't give us any details on it.

9        And Mr. Bonano sat in the front row or whatever in the

10  boxing match and watched this.  But I think that we were taking

11  pictures of this guy because Mr. Bonano wanted to find out who

12  his competition was dealing with.

13  Q.   Did you use equipment to photograph this guy that was paid

14  for with that federal grant?

15  A.   Yes.

16  Q.   And that federal grant said use it specifically for child

17  pornography cases?

18  A.   Yes.

19  Q.   And you were instructed by Charles Foti and Les Bonano to

20  use it at a boxing match?

21  A.   That's correct.

22  Q.   And you objected to that?  You did it, but you objected to

23  it?

24  A.   Yes.

25  Q.   And that's when you first started to get them angry at

1    you; is that right?

2    A.    They first started getting angry when I objected to them

3    having us work cases that were involving a guy that was mass

4    producing music CDs and selling them.

5         I mean, I had several cases on my desk at the time, and

6    some of them had real child victims that had been molested; and

7    I didn't really see that CDs were a higher priority than, you

8    know, kids whose lives might get ruined.  And so I brought it

9    up at that point because it bothered me that we were being

10   asked to work those types of cases.

11   Q.    Once again, they were instructing you to use federal funds

12   to go after CDs, music?

13   A.    Yes.

14   Q.    And you objected to that?

15   A.    Yes.

16   Q.    What were you told?

17   A.    Essentially to not make a big deal out of it.  And they

18   sent out an e-mail telling us not to work on any more cases

19   that weren't internet crimes against children cases; and then

20   within a week or two, they were asking us to work on cases that

21   clearly were not internet crimes against children cases.

22        And they would claim --

23             THE COURT:  Who is "they"?  Who is "they"?

24             THE WITNESS:  Les Bonano and Clay Reeves primarily.

25             THE COURT:  All right.  Go ahead.

1   BY MR. MCLINDON:

2   Q.   So they suspended you without pay for that; is that right?

3   A.   That's correct.

4   Q.   Okay.  And then they fired you?

5   A.   Yes.

6   Q.   Okay.  Did you ever work with a lawyer named Steve Martin?

7   A.   Yes.

8   Q.   Is he in court today?

9   A.   He is right there.

10  Q.   This guy right here?

11  A.   Uh-huh.

12  Q.   Okay.  He's still with the AG's office?

13  A.   Yes.

14  Q.   Is he a friend of yours?

15  A.   What?

16  Q.   Is he a friend of yours?

17  A.   Uh-huh.  I consider him a friend.

18           THE COURT:  Wait.  One at a time.

19           MR. McLINDON:  I'm sorry.  That's my fault, Judge.

20       Still to this day is he a friend of yours?

21           MR. AMUNDSON:  I don't know why this is relevant.

22           THE COURT:  I'll sustain the objection.

23           MR. McLINDON:  Okay.  I'll move on.

24  BY MR. MCLINDON:

25  Q.   Okay.  You get fired.

1    After you're fired, did the Attorney General who fired you

2    call you back and ask you to come work?

3    A.   Steve Martin did, asked me to come and work on the case

4    that they had asked me to work on for free for -- because I was

5    the initial person who did the search warrant on it and had

6    done most of the work on it.  And the weekend before trial, I

7    went in and reviewed some of the -- I loaded up the forensics

8    software and picked through some of the information and

9    reviewed some of the documents I generated to refresh my memory

10   for trial, and I testified as an expert for Steve in that case.

11   Q.   So you went to court, state court here in Baton Rouge?

12   A.   In the 19th, yes.

13   Q.   And were qualified as an expert --

14   A.   Yes.

15   Q.   -- for the government?

16   A.   Yes.

17   Q.   And they let you do that after they fired you?

18   A.   Yes.

19   Q.   They must not have had any problems with your credibility,

20   I guess, at that time.

21   A.   I would guess not.

22   Q.   You are doing testimony for defense lawyers throughout the

23   state?

24   A.   I have a case in Texas.  I don't believe I have any more

25   cases that I have to testify on right -- that I know of in

1   Louisiana at the moment.

2   **Q.**   Are you still willing to testify for the government?

3   **A.**   Yes.  I would love to testify for the government.  I'll

4   testify for anybody that can use my help.  I mean, part of the

5   reason I went to law school is I wanted to be a prosecutor, and

6   I still do.

7   **Q.**   So if the U.S. Attorney's office contacted you, you

8   wouldn't have any problem testifying for them?

9   **A.**   Not at all.

10  **Q.**   What about the AG's office?  If they contacted you, would

11  you testify for them?

12  **A.**   Yes.

13  **Q.**   Is Charles Foti still in office?

14  **A.**   No.

15  **Q.**   And everything you had said today about your analysis of

16  the forensic evidence in this case is true and correct; is that

17  right?

18  **A.**   That's correct.

19         **MR. McLINDON:**  Okay.  Thank you very much,

20  Mr. Castille.

21         **THE COURT:**  Okay.  You can step down.

22      May I ask the jury to step out just for a second, please.

23  Don't discuss the case.

24      Hold it a second.

25      I want the jury to go.  Let's let the jury go first.

1    Do not begin discussing the case.  This won't take but a

2    second.

3         *(Jury out.)*

4         THE COURT:  Okay.

5    Sir, I have grave concern regarding the applications that

6    you submitted to the bar.  And I know lawyers are bound by the

7    Code of Professional Responsibility.  And if a lawyer knows of

8    something that might be in violation, it should be reported.

9    Or if the lawyer himself knows he may have done something

10   that's inappropriate, the lawyer can self-report.

11        I'm real concerned about the testimony today, and

12   particularly, I think, the falsification on your applications

13   for the bar.  And I think Charles Plattsmier should have a copy

14   of the transcript, unless you are going to self-report

15   yourself.

16        THE WITNESS:  I would be happy to do that, your

17   Honor.  I mean, in both cases --

18        THE COURT:  Well, if you self-report yourself, you

19   send me a copy.

20        THE WITNESS:  Okay.

21        THE COURT:  If I don't have a copy within ten days,

22   then I'm going to submit a transcript to Plattsmier.  And I

23   would be more than happy to let the Bar Association have a

24   copy.

25        You're starting off on the wrong foot.

1       THE WITNESS:  Your Honor, that was not my intention.

2       THE COURT:  Well, it may not have been your

3   intention, but you're starting off on the wrong foot.

4       The law profession is a great profession.  It takes a long

5   time to study, as you know, to get through three years of law

6   school.

7       But if this is the way you're going to start, you're going

8   to have a very difficult time finishing.

9       So I don't know what the procedures are regarding the bar

10  exam.  I don't know whether Mr. Plattsmier has control of that

11  or not, or the Supreme Court, Chief Justice Kimball.  But one

12  way or the other, I think you need to let them know about the

13  differences in your applications, unless they already know.

14  And you know whether they already know or not.  Okay?

15      THE WITNESS:  Okay.  I'm not aware if they know the

16  differences.  And I wasn't -- I didn't realize that they were

17  different until today.  I typed up a lengthy --

18      THE COURT:  Well, listen, I'm not telling you you've

19  done anything wrong.  But if there are different applications

20  saying different things, and you're certifying it and you're

21  trying to become a member of the bar, you know, that's

22  important.

23      If you have a federal judge -- if you have somebody in the

24  Western District concerned, or your statement over there was

25  different from here today, then I'm real concerned.

1    And I'm talking about application for the bar.  I'm not

2  talking about your credibility for giving an opinion today, but

3  I'm talking about your applications.  And I think you ought to

4  self-report it.  And if you don't self-report it --

5    Actually, the lawyers ought to do this and not me.

6    But I think it needs to be -- and like I say, I don't know

7  if it's the President of the State Bar, I don't know if it's

8  Chief Justice Kimball, or Mr. Charles Plattsmier, but you ought

9  to do something and get this cleaned up; start your career off

10  properly.  Tell them the truth, whatever it is.  And you can

11  write -- you can order a transcript if you want and put all the

12  things you said today and explain, but --

13         **THE WITNESS:**  I would be happy to do that.

14         **THE COURT:**  Well, that's your business.  That's

15  between you and the Bar Association.

16    But if I wouldn't say something now, I would feel like I'm

17  not carrying out my responsibility as a member of the bar, as

18  well as a judge; because one day you're going to apply to be a

19  member of the Court.  And I tell you, based on what I heard

20  today, I'm not sure I would vote to admit you to the Middle

21  District.  Now, other judges might.

22    You need to get this cleaned up so that you can have a

23  good career in whatever you plan to do.  All right?

24         **THE WITNESS:**  Okay.

25         **MR. McLINDON:**  Judge, if I could just say something

1 on behalf of Mr. Castille: I didn't go into a lot of the
2 questions that I could have gone into, what they have done to
3 this man.

4        **THE COURT:** What I'm saying is, this is the point.
5 The point is I'm not talking about what happened at the
6 Attorney General's office. I'm talking about what he said in
7 his applications to the bar, and they were different. So all
8 I'm saying, all I'm saying to Mr. Castille is, I think, because
9 he had two different applications, he ought to submit it now;
10 because if this comes -- and get it straight. Just whatever he
11 wants to say, even all the questions you were going to ask,
12 it's okay with me -- but he ought to give a full explanation
13 and get his business straight. Because studying for the bar is
14 very difficult. Everybody, you know, if you've studied for the
15 bar, you know what you have to go through. And all I'm
16 suggesting to him is there are two different applications with
17 two different reasons, and he should get that straight with the
18 Bar Association.

19     I'm not talking about -- if he wants to put all that stuff
20 about the Attorney General, that's fine with me. You know, I
21 don't know whether he's right or wrong or the Attorney
22 General's office is right or wrong. But my only concern, very
23 narrow: Two different answers on the application that's
24 submitted to the bar. That is not a good way to start a legal
25 career, and that's all I'm saying.

1    We've got a jury.  We have to go.  Okay?

2              MR. McLINDON:  All right.  That's fine.

3              THE COURT:  Call the jury back in, please.

4    Have your next witness ready.

5              MR. McLINDON:  Your Honor, it depends --

6    Yes, I'll call Larry Jones, FBI agent.

7    The last witness, Judge, will be very short.

8              THE COURT:  You can call as many witnesses as you

9    want.  I just want you to have your witness ready because I

10   would like to, you know, complete tonight, if we can, complete

11   the evidence tonight.

12                           * * *

13              *(End of requested transcript)*

14                           -OOO-

15                   REPORTER'S CERTIFICATE

16       I certify that the foregoing is a correct transcript from

17   the record of proceedings in the above matter.

18

19   Date:   January 14, 2009

20                              *Estella O Champion*

21                   ESTELLA O. CHAMPION, CCR, CRR, CMR

22

23

24

25

**–**

-oOo [1]   61/14

**0**

06-181-FJP-DLD-1 [1]   1/4

**1**

1/1/1980 [1]   21/17
14 [2]   1/5 61/19
15 [2]   35/3 35/4
190 [1]   9/5
1980 [1]   21/17
19th [2]   5/7 55/12

**2**

20 [1]   10/23
200 [9]   7/23 8/4 8/5 9/4
  9/7 14/19 25/20 25/21 27/12
2000 [2]   7/22 7/23
2001 [5]   7/7 7/7 7/22
  27/13 28/2
2005 [1]   1/5
2007 [3]   43/8 43/17 44/9
2008 [2]   40/4 40/18
2009 [1]   61/19
208 [1]   1/14
20th as [1]   28/14
225 [1]   1/24
2:30 [1]   35/8

**3**

300 [1]   17/25
3565 [1]   1/24
389-3565 [1]   1/24

**4**

40 [2]   35/1 36/19
4th [1]   28/2

**5**

5:00 p.m [1]   39/2

**7**

70801 [2]   1/15 1/23
70810 [1]   1/18
777 [2]   1/14 1/23

**8**

8480 [1]   1/17
8:30 [6]   1/6 34/19 34/24
  35/15 38/3 50/15
8:30 and [1]   38/21
8:30 every [1]   38/1
8:30 to [8]   34/15 34/17
  35/11 35/24 38/10 38/15
  38/24 43/4

**9**

98 [2]   15/24 29/16

**A**

A.M [1]   1/6
able [3]   7/2 7/6 20/5
about [47]
above [2]   47/15 61/17
access [26]   7/19 8/10
  11/14 16/13 16/16 22/25
  23/3 23/9 23/11 24/9 24/11
  24/23 25/2 25/22 25/24

25/24 25/25 26/2 26/3 26/6
  26/11 26/21 26/22 27/2
  27/13 28/16
accessed [11]   7/14 9/4
  11/25 13/21 13/23 17/21
  23/4 23/7 24/22 26/8 26/13
accesses [1]   28/14
accessing [2]   21/1 26/16
accurate [4]   26/7 26/10
  28/5 28/13
act [2]   11/9 47/24
ACTION [1]   1/4
activities [1]   13/16
activity [1]   44/2
actual [1]   16/18
actually [13]   7/15 8/7
  24/13 30/5 31/7 31/13 35/12
  38/5 44/2 47/15 49/3 51/14
  59/5
ad [1]   18/4
add [5]   18/6 18/9 18/11
  39/3 43/3
additional [4]   30/11 30/18
  35/13 43/25
administration [1]   42/10
admit [1]   59/20
admitted [1]   40/16
affect [1]   18/3
afraid [1]   45/13
after [7]   12/9 34/14 43/25
  46/13 53/12 55/1 55/17
afternoon [2]   21/23 35/9
AG's [3]   51/24 54/12 56/10
again [5]   17/17 19/6 25/14
  43/1 53/11
against [15]   3/22 5/22
  5/23 6/2 6/8 35/8 37/15
  42/8 42/11 42/14 42/18
  42/20 44/4 53/19 53/21
agency [1]   11/12
agent [8]   4/19 6/23 10/23
  22/19 22/19 32/1 33/7 61/6
agents [1]   22/14
agree [2]   19/25 32/21
Aguillard [1]   46/18
ahead [3]   39/8 52/6 53/25
all [33]
alleged [1]   51/23
allow [3]   17/7 44/23 44/24
almost [1]   46/17
along [3]   4/6 13/12 50/10
already [3]   43/9 58/13
  58/14
also [12]   4/6 4/17 5/23
  5/25 6/19 22/9 29/7 30/17
  43/3 43/4 44/10 51/21
alter [4]   11/4 12/20 34/12
  46/7
altered [3]   7/18 34/14
  37/23
always [1]   50/20
amended [1]   20/15
AMERICA [2]   1/3 1/12
among [1]   21/2
amount [4]   35/1 37/23 38/4
  48/11
AMUNDSON [2]   1/13 21/25
analysis [2]   14/22 56/15
analyze [1]   4/7
and/or [1]   31/6

ANDING [1]   1/17
angry [2]   52/25 53/2
Anna [1]   51/2
another [7]   19/4 20/5 21/8
  26/15 26/16 27/18 29/13
answer [7]   25/9 25/10 30/7
  30/15 37/25 45/20 47/11
answered [4]   15/18 43/9
  49/13 49/14
answers [3]   37/20 40/9
  60/23
antivirus [5]   23/8 26/23
  30/1 30/4 30/18
any [38]
anybody [2]   47/23 56/4
anything [14]   4/9 7/8 9/15
  12/22 12/23 14/13 16/16
  16/25 32/4 32/14 36/8 42/18
  43/23 58/19
anyway [2]   44/6 44/25
apologize [2]   26/8 36/16
appear [2]   32/3 32/9
appears [1]   15/19
application [11]   40/2 40/3
  40/6 40/10 40/18 41/7 43/8
  43/11 43/12 59/1 60/23
applications [10]   39/21
  39/24 57/5 57/12 58/13
  58/19 59/3 60/7 60/9 60/16
applied [2]   39/16 39/18
apply [1]   59/18
appoint [2]   47/23 48/2
appointed [4]   47/18 47/20
  47/22 47/24
appropriate [1]   21/5
approved [1]   48/2
approximately [3]   7/22 8/5
  9/5
are [36]
area [1]   29/21
areas [1]   5/24
aren't [1]   30/18
argument [1]   19/13
around [3]   5/24 9/7 35/11
as [41]
ask [9]   3/13 10/9 21/3
  22/1 51/13 52/3 55/2 56/22
  60/11
asked [15]   20/2 24/5 37/17
  41/9 43/9 44/20 46/21 49/13
  49/14 51/11 52/2 52/4 53/10
  55/3 55/4
asking [6]   41/22 42/10
  42/19 48/21 48/21 53/20
asks [2]   25/9 41/3
assigns [1]   13/9
assist [1]   5/21
Assistant [1]   21/25
associated [4]   7/12 13/14
  22/23 23/1
Association [3]   57/23
  59/15 60/18
associations [1]   6/1
assume [1]   28/13
assuming [2]   27/16 28/5
at [68]
attended [1]   5/15
attention [4]   41/21 43/1
  44/14 44/16
attorney [21]   3/20 3/23

**A**

attorney... **[19]** 5/20 6/5 11/16 12/25 22/1 25/8 33/2 33/8 40/16 42/22 44/4 45/24 46/8 49/22 50/22 55/1 60/6 60/20 60/21
ATTORNEY'S **[2]** 1/13 56/7
attorneys **[5]** 6/1 48/24 49/1 49/4 49/5
authorize **[1]** 18/6
average **[1]** 16/16
averaged **[1]** 35/1
Avoid **[2]** 36/13 36/14
aware **[2]** 10/22 58/15
away **[1]** 45/17

**B**

back **[16]** 7/6 7/7 14/10 14/14 14/15 14/18 14/19 17/22 38/3 38/12 38/22 39/1 44/20 49/21 55/2 61/3
background **[2]** 3/14 16/10
bar **[31]**
based **[4]** 28/3 38/20 43/2 59/19
Basic **[1]** 13/5
basically **[1]** 6/3
basis **[2]** 11/22 46/17
baton **[6]** 1/15 1/18 1/23 4/16 4/24 55/11
battery **[3]** 21/12 21/14 21/18
be **[33]**
because **[37]**
become **[1]** 58/21
been **[16]** 3/5 5/16 7/23 10/5 18/23 19/20 19/21 19/22 21/18 25/4 33/13 40/19 43/5 49/3 53/6 58/2
before **[14]** 1/8 3/19 3/20 5/3 5/11 5/13 19/12 22/18 30/5 32/10 37/6 39/10 50/22 55/6
began **[1]** 19/12
begin **[1]** 57/1
behalf **[4]** 37/9 49/6 49/12 60/1
being **[10]** 7/25 12/23 12/24 20/5 21/11 26/4 26/17 32/20 37/17 53/9
believe **[5]** 21/18 22/13 32/21 40/25 55/24
better **[3]** 48/17 48/23 48/25
between **[3]** 14/13 38/4 59/15
beyond **[2]** 23/11 39/5
big **[2]** 12/2 53/17
bios **[22]** 13/2 13/3 13/5 13/6 13/9 13/11 13/15 13/17 13/19 13/22 13/25 14/2 14/4 14/16 21/13 27/20 27/21 27/24 28/8 28/11 28/13 28/16
bit **[2]** 4/4 14/18
bitter **[2]** 45/22 45/23
blocker **[7]** 11/14 11/21 11/25 12/2 12/8 12/10 12/22
blockers **[2]** 11/23 12/25

blower **[1]** 44/2
blower-type **[1]** 44/2
BLUEBONNET **[1]** 1/17
Bonano **[8]** 46/20 51/8 51/19 52/2 52/9 52/11 52/19 53/24
bookmark **[1]** 18/11
bookmarks **[8]** 17/14 17/18 17/24 17/25 18/3 18/7 18/9 32/11
boots **[1]** 27/5
boss **[1]** 50/20
both **[3]** 6/1 11/11 57/17
bothered **[1]** 53/9
BOULEVARD **[1]** 1/17
bound **[1]** 57/6
box **[2]** 41/7 46/2
boxing **[9]** 42/21 42/23 51/21 51/21 52/3 52/5 52/8 52/10 52/20
breaking **[1]** 46/3
briefly **[2]** 16/20 32/22
bring **[4]** 11/21 11/23 12/5 12/8
broad **[1]** 20/12
broken **[2]** 28/9 28/11
brought **[6]** 8/1 8/2 8/3 43/1 51/14 53/8
browse **[1]** 16/6
browser **[2]** 17/18 17/20
browsers **[2]** 17/19 17/20
building **[1]** 46/2
bulk **[1]** 6/5
bunch **[1]** 9/23
buried **[1]** 15/22
Burton **[2]** 10/23 32/1
business **[2]** 59/14 60/13
but **[78]**
button **[1]** 15/8
buy **[1]** 29/16

**C**

C drive **[9]** 14/24 15/1 15/9 15/9 15/22 16/7 16/10 16/12 16/13
C-A-S-T-I-L-L-E **[1]** 3/12
C:\My **[3]** 15/24 16/2 29/1
C:\Rapido\My **[1]** 15/25
call **[5]** 3/4 55/2 61/3 61/6 61/8
called **[3]** 15/1 15/2 41/21
calls **[1]** 25/9
came **[3]** 35/3 36/21 49/24
Campbell **[2]** 6/23 22/19
Campbell's **[1]** 22/20
can **[61]**
can't **[8]** 8/3 12/11 16/18 20/9 27/14 27/17 28/9 32/8
cancel **[1]** 14/12
candor **[1]** 40/12
capable **[1]** 32/13
capacity **[1]** 4/14
card **[2]** 9/22 10/2
career **[4]** 5/15 59/9 59/23 60/25
carried **[1]** 10/25
carrying **[1]** 59/17
case **[30]** 6/17 6/21 7/4 11/23 15/24 16/2 22/2 22/10 22/15 24/25 28/20 37/7

37/10 37/12 44/4 44/11 44/17 44/19 44/22 47/17 48/14 48/16 48/22 52/7 55/3 55/10 55/24 56/16 56/23 57/1
cases **[17]** 14/8 48/10 48/12 49/7 50/3 50/5 51/3 52/17 53/3 53/5 53/10 53/18 53/19 53/20 53/21 55/25 57/17
CASTILLE **[15]** 1/7 3/1 3/4 3/5 3/10 3/12 6/9 6/16 21/20 21/23 32/22 49/21 56/20 60/1 60/8
categorize **[1]** 31/22
Catholic **[1]** 5/2
caught **[1]** 34/16
cause **[8]** 17/4 25/22 26/21 26/22 30/24 32/2 32/8 45/17
caused **[1]** 31/1
CCR **[1]** 61/21
CD **[2]** 30/12 42/12
CDs **[5]** 6/19 42/12 53/4 53/7 53/12
Center **[1]** 11/6
certain **[6]** 10/5 10/5 14/9 20/11 35/1 44/1
certainly **[2]** 25/16 30/24
certainty **[1]** 27/15
CERTIFICATE **[1]** 61/15
certify **[1]** 61/16
certifying **[1]** 58/20
Champion **[2]** 1/21 61/21
chance **[1]** 31/15
change **[12]** 8/9 14/12 18/7 23/11 24/23 25/23 26/21 26/23 27/2 30/3 30/5 46/12
changed **[7]** 23/4 27/10 27/13 31/23 39/1 46/17 47/10
changes **[1]** 26/11
changing **[1]** 9/23
characters **[1]** 41/16
charge **[2]** 45/13 46/3
Charles **[9]** 45/19 50/20 50/24 51/2 51/24 52/19 56/13 57/13 59/8
check **[4]** 13/11 16/2 41/6 41/7
checked **[2]** 9/11 41/1
checks **[1]** 13/8
Chief **[2]** 58/11 59/8
child **[11]** 6/6 19/3 30/25 31/2 32/2 32/9 37/12 50/3 50/5 52/16 53/6
children **[16]** 3/22 5/22 6/2 6/8 35/8 35/8 37/14 37/16 42/8 42/12 42/19 42/20 43/1 48/9 53/19 53/21
choose **[1]** 24/2
circumstances **[2]** 41/3 41/12
civil **[1]** 49/3
CJA **[1]** 47/24
claim **[1]** 53/22
class **[1]** 11/5
classes **[1]** 5/16
Clay **[3]** 46/11 46/19 53/24
cleaned **[2]** 59/9 59/22
clear **[1]** 21/15

## C

cleared [1]   21/18
clearly [2]   9/18 53/21
click [7]   8/9 8/11 14/12
  15/7 15/8 23/23 24/6
clicking [1]   14/12
clock [17]   7/7 13/4 13/22
  14/9 14/13 14/14 14/17
  21/13 21/18 27/16 27/20
  27/21 27/24 28/8 28/11
  28/13 28/16
close [3]   8/12 9/2 31/21
cluttered [1]   17/25
CMR [1]   61/21
code [3]   31/6 31/9 57/7
Collar [1]   11/6
college [3]   4/20 4/21
  31/22
colors [1]   9/25
combination [1]   45/5
come [6]   29/16 44/11 44/20
  45/17 55/2 55/3
comes [3]   9/18 48/15 60/10
coming [2]   38/21 48/8
companies [2]   30/2 31/19
competition [1]   52/12
complete [3]   40/1 61/10
  61/10
completed [3]   36/21 39/22
  40/19
completely [1]   16/1
computer [79]
computers [3]   16/23 17/2
  21/17
concern [2]   57/5 60/22
concerned [4]   36/17 57/11
  58/24 58/25
concerning [1]   28/2
conduct [2]   12/11 52/4
conducted [2]   12/8 13/16
Conference [1]   39/23
configuration [1]   9/24
confusion [1]   3/23
connected [1]   32/2
consider [2]   6/12 54/17
consistent [1]   8/24
contacted [2]   56/7 56/10
contents [1]   16/11
continue [1]   20/8
continued [1]   42/19
control [1]   58/10
copy [9]   6/25 20/13 20/14
  20/15 20/22 57/13 57/19
  57/21 57/24
COREY [3]   1/13 20/23 21/25
correct [52]
correction [1]   38/12
correctly [1]   34/13
corresponded [1]   12/18
could [11]   8/16 11/24 15/6
  20/11 20/12 25/12 25/22
  38/3 41/16 59/25 60/2
couldn't [4]   4/10 28/16
  41/17 44/19
counsel [1]   51/13
counts [1]   40/1
couple [7]   3/13 6/19 8/14
  24/2 26/5 38/11 39/10
course [1]   11/13

## D

court [14]   1/1 5/5 5/6 5/7
  20/9 37/3 38/6 47/18 47/20
  54/8 55/11 55/11 58/11
  59/19
courthouse [1]   1/22
courtroom [2]   6/22 8/20
cover [2]   36/7 36/10
covered [1]   20/12
coworker [1]   42/13
coworkers [1]   43/4
create [2]   13/8 29/19
created [6]   7/13 7/16
  13/10 13/20 23/1 24/20
creation [2]   7/15 13/17
credibility [2]   55/19 59/2
crime [4]   3/21 11/6 37/15
  42/18
crimes [12]   3/22 5/22 5/25
  6/2 6/8 35/7 37/15 42/8
  42/11 42/20 53/19 53/21
criminal [2]   1/4 6/1
cross [2]   21/21 51/15
cross-examination [1]
  51/15
CRR [2]   1/21 61/21
CV [1]   19/21

## D

dangers [1]   5/22
database [1]   42/4
date [47]
dates [26]   7/12 13/2 13/6
  13/13 13/15 13/25 14/4
  14/15 22/23 23/11 24/11
  25/2 25/23 25/24 25/24
  25/25 26/2 26/3 27/21 27/24
  27/25 28/3 28/5 28/10 28/14
  28/17
day [10]   8/10 14/9 35/5
  35/14 35/24 38/1 38/1 50/15
  54/20 59/18
days [3]   14/16 38/11 57/21
deal [1]   53/17
dealing [1]   52/12
December [2]   40/3 40/18
December 2008 [1]   40/18
default [3]   27/10 29/8
  29/10
defendant [5]   1/6 1/16
  37/9 48/17 48/22
defendant's [3]   6/20 28/20
  48/1
defendants [2]   5/13 48/9
defense [6]   3/3 6/1 48/24
  49/1 49/4 55/22
definition [2]   16/21 17/2
delete [1]   17/8
demand [1]   49/4
denied [1]   51/22
Department [2]   3/25 4/18
depend [1]   8/16
depends [3]   8/13 26/3 61/5
deputy [1]   4/16
describe [1]   31/19
described [1]   23/15
designed [2]   17/2 17/4
desk [1]   53/5
desktop [2]   15/20 16/3
details [3]   47/5 48/6 52/8
detect [2]   30/2 30/4

## D

detection [1]   36/14
determine [1]   7/6
device [1]   12/22
devices [1]   32/2
did [62]
didn't [28]   7/3 7/3 11/23
  12/20 18/6 24/25 25/3 29/5
  31/14 35/12 36/8 36/20 40/2
  41/6 41/7 42/3 42/20 45/12
  46/21 47/6 47/13 47/23 48/2
  50/18 50/24 53/7 58/16 60/1
die [1]   21/14
died [1]   21/19
difference [2]   38/4 39/2
differences [2]   58/13
  58/16
different [32]
difficult [2]   58/8 60/14
direct [3]   3/8 10/9 26/6
disagree [1]   34/1
disciplined [1]   40/20
discuss [1]   56/23
discussing [1]   57/1
disk [2]   18/17 18/19
display [1]   9/25
displayed [1]   26/4
displaying [1]   26/17
dispute [1]   30/21
distinguish [1]   24/18
DISTRICT [8]   1/1 1/2 1/9
  1/14 5/6 37/6 58/24 59/21
division [2]   42/22 51/20
DLD [1]   1/4
do [64]
documents [19]   6/18 15/2
  15/11 15/12 15/13 15/19
  15/21 15/22 15/23 15/25
  15/25 16/3 28/21 28/24 29/1
  29/2 29/7 36/25 55/9
does [15]   8/6 17/5 28/17
  29/17 30/3 30/5 31/3 31/5
  31/7 31/20 31/23 31/24
  42/5 43/24 48/12
doesn't [6]   9/17 28/16
  28/19 29/16 31/24 43/23
doing [9]   3/14 30/8 32/13
  32/13 34/1 35/10 42/25 49/9
  55/22
don't [40]
done [13]   9/15 22/3 22/6
  22/10 22/12 36/18 44/20
  48/6 49/11 55/6 57/9 58/19
  60/2
double [1]   8/9
down [7]   17/10 34/17 34/19
  34/24 41/19 43/4 56/21
download [2]   19/3 21/7
downloading [3]   21/1 30/24
  31/1
downloads [1]   29/8
Dr. [1]   51/2
Dr. Anna [1]   51/2
drive [17]   6/24 6/25 11/14
  11/25 12/10 12/11 12/23
  14/24 15/1 15/9 15/9 15/22
  16/7 16/10 16/12 16/13 22/3
duly [1]   3/5
during [3]   26/6 38/17 46/8

e-mailed [1] 20/2
e-mails [1] 17/9
each [3] 13/15 20/7 23/1
EARL [2] 1/5 1/16
earlier [5] 17/14 32/18
 32/20 35/21 42/2
easier [2] 1/18 34/25
East [1] 4/16
easy [1] 30/3
edit [3] 13/11 36/4 36/5
effect [2] 21/11 30/23
eight [4] 39/1 39/1 50/7
 50/8
either [2] 8/7 17/14
elected [1] 50/25
electronic [1] 4/7
else [1] 44/19
employee [3] 34/25 36/20
 50/13
End [1] 61/13
enforcement [2] 4/15 5/24
engine [1] 18/2
entire [2] 34/23 35/2
equipment [1] 52/13
erased [2] 36/4 42/4
erasing [3] 34/6 34/8 36/8
ESQUIRE [4] 1/12 1/13 1/16
 1/19
essentially [5] 13/5 17/20
 23/19 44/10 53/17
Estella [2] 1/21 61/21
even [6] 9/2 31/16 31/17
 31/22 50/11 60/11
ever [9] 4/14 5/3 5/18
 11/15 11/18 14/15 40/19
 49/11 54/6
every [11] 7/11 11/12
 11/12 13/4 25/4 31/20 35/14
 35/24 38/1 38/11 50/15
everybody [3] 17/24 19/11
 60/14
everything [4] 4/4 12/9
 20/12 56/15
evidence [9] 4/7 4/8 11/5
 11/8 11/10 11/10 12/21
 56/16 61/11
exact [2] 45/4 46/15
exactly [1] 48/5
exam [6] 3/17 12/12 25/12
 29/5 43/7 58/10
examination [8] 3/8 7/4
 8/25 21/21 22/3 43/17 49/19
 51/15
examiner [3] 4/19 33/6
 33/7
examiner/special [1] 4/19
examiners [7] 30/21 39/24
 41/20 43/17 44/9 46/21 47/6
EXCERPT [2] 1/8 3/1
exculpatory [1] 11/11
Excuse [4] 19/11 33/16
 36/15 44/17
execute [1] 11/15
executed [1] 10/22
execution [1] 4/6
expensive [1] 22/9
experience [1] 45/21
expert [9] 5/3 5/8 6/9

6/13 22/15 48/2 50/2 55/10
 55/13
explain [4] 25/10 33/17
 34/22 59/12
explanation [11] 38/9
 38/16 38/17 41/3 41/11
 41/15 41/18 43/6 43/7 45/18
 60/12
exploitation [2] 37/14
 48/9
Explore [1] 15/8
Explorer [5] 15/6 15/7
 15/8 24/23 29/9
external [1] 32/2

**F**

face [1] 19/11
fact [8] 18/16 25/21 28/1
 28/16 33/21 34/14 41/21
 49/1
fair [9] 23/4 23/5 23/24
 27/22 28/6 28/7 40/13 45/22
 48/11
fairly [1] 44/1
falsification [2] 37/18
 57/12
falsified [3] 36/2 36/25
falsify [1] 46/6
falsifying [6] 33/11 33/14
 33/22 34/1 34/15 38/9
familiar [3] 15/19 22/14
 23/17
far [1] 51/5
father [1] 44/3
fault [1] 54/19
favor [1] 51/16
favorite [1] 17/21
favorites [3] 17/15 32/12
 32/14
FBI [11] 6/19 6/20 7/2
 18/17 22/12 22/14 30/12
 30/21 32/1 45/10 61/6
fear [1] 45/17
February [1] 3/18
federal [15] 5/5 5/6 37/3
 37/6 38/6 41/22 42/7 42/24
 43/23 45/9 49/24 52/14
 52/16 53/11 58/23
feds [1] 50/1
feel [1] 59/16
fees [1] 48/2
fell [1] 14/10
felt [2] 20/11 42/23
few [1] 22/1
field [4] 4/8 6/10 6/13
 41/17
fields [5] 10/5 34/6 34/9
 36/4 36/5
figure [2] 4/10 44/19
file [28] 7/11 7/13 7/13
 7/14 7/15 7/18 7/20 8/8
 8/11 8/15 13/8 13/9 13/11
 13/19 13/23 13/23 14/5
 15/21 23/1 24/18 24/19 25/4
 26/11 26/16 26/16 26/20
 29/7 29/17
files [22] 7/23 8/4 8/7
 8/8 9/4 9/5 11/10 12/17
 13/7 13/14 14/19 16/15 17/8
 21/2 21/2 22/22 23/9 24/12

24/20 25/1 27/8 27/12
fill [3] 35/5 35/6 35/13
filling [1] 36/18
find [9] 13/13 15/10 16/17
 18/1 18/2 23/23 24/7 31/20
 52/11
fine [4] 9/13 38/24 60/20
 61/2
finish [4] 30/14 34/4
 36/15 44/22
finished [1] 3/15
finishing [1] 58/8
fire [1] 42/6
fired [21] 34/2 34/5 34/8
 34/10 38/20 39/4 41/8 42/3
 42/3 43/18 43/19 44/2 44/3
 44/7 44/25 46/1 54/4 54/25
 55/1 55/1 55/17
firewall [1] 16/17
firing [7] 34/3 39/6 39/7
 39/10 42/5 46/23 47/7
first [12] 11/7 12/1 20/14
 20/17 20/21 31/14 36/1
 39/22 39/25 52/25 53/2
 56/25
fit [2] 38/23 41/16
five [17] 8/19 8/24 34/15
 34/17 34/19 34/24 35/5
 35/11 35/15 35/24 38/1
 38/10 38/15 38/24 43/4 50/7
 50/15
FJP [1] 1/4
florida [2] 1/14 1/23
folder [22] 9/8 14/25 15/1
 15/2 15/2 15/10 15/10 15/11
 15/11 15/12 15/13 15/23
 16/1 16/3 23/9 23/9 25/1
 25/6 29/1 29/2 29/14 29/14
folders [1] 15/17
following [2] 40/19 42/19
follows [1] 3/6
fool [1] 35/12
foot [2] 57/25 58/3
Force [1] 3/22
foregoing [1] 61/16
forensic [10] 4/3 4/4 4/19
 7/3 12/11 22/3 29/5 33/6
 33/7 56/16
forensics [9] 5/9 5/17 6/3
 6/10 11/1 11/4 11/6 11/13
 55/7
forget [2] 38/25 38/25
forgetting [1] 38/22
forgot [2] 38/2 44/5
forgotten [1] 38/11
forward [1] 14/11
Foti [9] 45/19 46/13 46/13
 50/20 50/24 51/2 51/24
 52/19 56/13
Foti's [1] 51/8
found [8] 8/25 14/23 15/16
 15/22 18/13 30/11 30/22
 43/19
fourth [2] 7/24 28/13
fourth and [1] 28/13
FRANK [1] 1/8
free [1] 55/4
frequently [1] 11/22
friend [4] 54/14 54/16
 54/17 54/20

## F

friends [1]  45/23
front [2]  14/6 52/9
FTK [1]  11/7
full [7]  12/11 16/14 40/2
40/2 40/3 41/17 60/12
funds [1]  53/11
further [1]  49/16
future [1]  14/10

## G

gaming [1]  51/22
Gateway [1]  14/19
gave [7]  30/12 32/24 33/12
34/11 42/5 43/7 50/1
General [4]  3/24 50/22
55/1 60/20
General's [14]  3/21 5/20
6/6 11/16 12/25 33/2 33/8
42/22 44/4 45/24 46/9 49/22
60/6 60/22
generally [1]  8/11
generated [1]  55/9
generic [1]  18/5
gentlemen [1]  19/11
get [20]  4/11 10/11 15/3
15/5 17/25 24/22 34/3 39/6
39/8 39/10 44/18 52/25 53/8
54/25 58/5 59/9 59/22 60/10
60/13 60/17
gets [2]  13/10 14/14
getting [7]  10/7 36/17
47/17 50/11 51/9 51/12 53/2
give [4]  41/17 51/13 52/8
60/12
given [3]  5/18 10/5 18/17
giving [1]  59/2
go [26]  4/20 5/1 7/6 11/5
11/18 14/18 15/5 16/7 16/11
17/22 19/13 19/18 28/25
29/16 38/3 39/8 40/15 45/17
52/6 53/12 53/25 56/25
56/25 60/1 60/15 61/1
going [20]  10/16 10/19
12/5 13/14 13/24 14/16
18/23 21/12 27/25 31/21
40/15 45/13 46/1 47/5 57/14
57/22 58/7 58/7 59/18 60/11
gone [1]  60/2
good [4]  14/4 21/23 59/23
60/24
got [14]  25/18 25/21 29/21
34/16 38/2 38/5 38/12 42/2
42/3 48/17 48/22 50/8 50/25
61/1
gotten [1]  47/19
government [3]  55/15 56/2
56/3
graduated [3]  3/16 39/14
39/15
grant [9]  6/7 41/22 42/7
42/15 42/24 43/23 49/24
52/14 52/16
grave [1]  57/5
great [1]  58/4
group [1]  32/19
guess [3]  32/4 55/20 55/21
Guidance [1]  11/7
guy [4]  52/11 52/13 53/3

## H

hack [2]  17/7 17/11
had [34]
Haik [2]  37/7 38/17
happened [3]  14/7 28/2
60/5
happens [1]  17/3
happy [6]  43/2 44/22 49/8
57/16 57/23 59/13
hard [8]  6/24 6/25 11/14
11/25 12/10 12/11 12/23
Harry [1]  32/1
has [15]  7/11 10/5 10/8
13/4 18/23 19/7 19/20 19/21
19/21 21/18 21/19 31/23
40/15 45/21 58/10
have [78]
haven't [6]  22/3 22/20
31/2 31/9 31/16 49/10
having [6]  3/5 21/3 31/23
35/13 38/23 53/3
he [48]
he's [4]  34/21 47/24 54/12
60/21
head [2]  42/22 51/20
hear [3]  9/10 9/12 10/22
heard [6]  6/23 17/14 19/17
22/20 31/2 59/19
Hello [1]  21/24
help [1]  56/4
HENRY [2]  1/5 1/16
her [2]  20/3 22/21
here [6]  25/18 36/24 41/11
54/10 55/11 58/25
high [3]  3/21 5/1 5/2
higher [1]  53/7
him [6]  30/14 34/4 36/15
50/22 54/17 60/16
himself [1]  57/9
hired [1]  36/1
his [13]  9/10 9/12 16/5
16/7 19/6 19/19 19/21 19/24
30/14 51/12 52/12 60/7
60/13
Hold [1]  56/24
home [2]  18/7 35/8
honest [4]  20/7 31/13
45/20 45/20
honesty [1]  40/12
Honor [22]  3/3 6/11 10/3
18/23 19/7 19/16 20/25
25/13 30/16 32/16 36/16
39/6 43/10 43/11 47/12
49/15 49/16 51/4 51/9 57/17
58/1 61/5
HONORABLE [1]  1/8
hourly [1]  35/1
hours [8]  34/17 34/24 35/2
35/12 36/19 36/21 37/1 39/3
how [18]  4/10 4/12 5/23
5/24 6/3 6/23 8/11 8/17
10/1 12/2 13/6 15/3 31/4
33/4 36/20 47/17 48/6 48/14
however [1]  14/16
huh [18]  1/1 17/16 18/12
22/24 23/2 40/17 40/17
40/23 41/2 41/5 41/24 49/23

## 54/10

50/6 50/14 50/19 51/1 54/11
54/17
HUMPHREY [1]  1/19
hundred [2]  41/16 42/9
hundreds [6]  11/9 16/14
24/1 24/6 24/10 25/20

## I

I'll [5]  38/24 54/22 54/23
56/3 61/6
I'm [29]  6/22 21/25 30/16
36/16 43/13 46/5 48/5 48/21
48/21 50/13 54/19 57/11
57/22 58/15 58/18 58/25
59/1 59/1 59/3 59/16 59/20
60/4 60/5 60/6 60/8 60/8
60/15 60/19 60/25
I've [9]  5/16 5/25 6/18
14/8 22/17 22/20 39/15 49/3
51/16
icon [1]  15/21
icons [1]  28/21
idea [2]  14/20 32/12
identify [2]  46/22 47/6
leyoub [2]  50/23 50/24
if [85]
image [21]  6/24 6/25 7/3
8/8 8/19 9/5 9/17 9/18 9/18
23/4 23/12 23/19 23/23
23/24 24/9 24/15 24/19
25/24 26/2 26/3 27/8
images [10]  8/14 9/23
12/15 12/16 23/22 24/3 24/7
25/2 25/21 27/11
imagine [1]  17/12
impact [1]  18/3
important [3]  24/18 48/20
58/22
impression [1]  45/8
in [151]
inaccurate [3]  27/22 27/25
28/17
inappropriate [1]  57/10
include [1]  20/4
included [2]  19/19 19/24
income [1]  48/8
incorrect [1]  13/24
inculpatory [1]  11/11
INDEX [1]  2/1
indicate [2]  31/18 31/24
infected [1]  18/20
information [5]  6/20 28/9
42/4 43/25 55/8
initial [1]  55/5
initially [1]  35/23
inmate [1]  51/21
Input [1]  13/5
instead [1]  14/11
instructed [4]  36/1 43/5
50/12 52/19
instructing [1]  53/11
integrity [2]  11/8 48/20
intention [2]  58/1 58/3
internally [1]  24/21
internet [12]  3/21 5/22
6/2 6/8 16/6 29/8 29/9
37/15 42/8 42/18 53/19
53/21
intimate [1]  47/4
into [11]  4/9 11/25 12/10

**I**

into... [8]   15/5 17/8
17/11 18/2 41/17 46/3 60/1
60/2
investigate [3]   5/25 50/4
50/5
investigation [2]   42/22
51/20
involve [1]   23/14
involved [2]   47/4 47/7
involving [2]   52/7 53/3
is [146]
isn't [5]   20/7 27/5 34/14
38/13 51/3
issue [2]   27/20 38/23
it [167]
it's [40]
itself [2]   16/22 31/3

**J**

Jackson [1]   4/21
James [2]   46/10 46/25
JANUARY [5]   1/5 43/8 43/17
44/9 61/19
job [4]   30/2 36/18 36/22
40/21
JOHN [1]   1/16
JONES [4]   1/12 20/2 22/16
61/6
JOSEPH [4]   1/7 3/1 3/4 3/5
judge [9]   1/9 37/7 38/17
47/25 54/19 58/23 59/18
59/25 61/7
judges [1]   59/21
jury [11]   1/8 3/2 6/12
13/3 38/18 56/22 56/25
56/25 57/3 61/1 61/3
just [37]
Justice [4]   4/1 4/19 58/11
59/8

**K**

Katrina [1]   51/3
keep [2]   17/20 38/3
keeps [3]   12/23 13/4 21/12
kids [2]   5/23 53/8
Kimball [2]   58/11 59/8
kind [1]   36/7 37/15
knew [3]   36/19 46/25 47/4
know [44]
knowledge [2]   22/18 46/23
knows [2]   57/7 57/9

**L**

LA [1]   1/15
Lafayette [1]   37/3
Landry [1]   8/20
laptop [1]   12/8
Larry [2]   22/16 61/6
last [11]   3/11 7/13 7/14
7/18 7/19 7/19 13/21 29/14
40/4 46/16 61/7
late [2]   35/4 35/9
later [5]   17/10 17/23
38/12 41/23 42/15
law [18]   3/16 3/19 3/20
4/14 4/23 5/23 39/14 42/24
43/20 44/6 44/8 44/10 44/25
45/7 45/9 56/5 58/4 58/5

**lawyer [6]**   48/1 48/1 54/6
57/7 57/9 57/10
lawyers [3]   55/22 57/6
59/5
layperson [1]   10/9
learned [1]   43/25
leave [4]   35/5 35/13 36/18
44/24
leaving [5]   43/19 44/6
44/8 44/24 45/7
lectured [1]   5/18
LEET [3]   1/5 1/16 8/1
left [4]   35/20 36/21 45/19
45/21
legal [1]   60/24
lengthy [3]   41/15 43/6
58/17
Les [5]   46/20 51/8 51/19
52/19 53/24
less [1]   32/13
let [16]   3/13 30/24 25/8
30/14 34/4 34/12 36/15
37/22 41/19 43/16 46/5
49/21 55/17 56/25 57/23
58/12
let's [9]   3/14 7/6 10/11
20/16 20/21 25/20 25/20
39/8 56/25
letting [1]   19/18
level [1]   14/25
license [1]   51/22
lieu [1]   40/21
like [12]   8/8 9/19 17/4
20/10 23/14 26/21 26/23
41/16 42/23 59/6 59/16
61/10
liked [1]   22/6
line [3]   19/8 28/1 50/10
list [4]   17/21 30/11 31/13
31/14
listen [1]   58/18
little [3]   4/3 14/18 15/20
lives [1]   53/8
loaded [1]   55/7
locate [1]   15/6
located [1]   14/24
location [4]   18/11 18/22
19/3 21/7
long [9]   8/11 8/17 9/16
12/12 33/4 36/21 45/25
48/15 58/4
longer [1]   42/17
look [15]   6/17 7/2 7/3
8/12 8/18 8/19 16/7 16/11
19/9 48/17 48/23 48/25
50/11 50/13 51/19
looked [4]   8/17 8/23 9/6
31/9
looking [5]   8/16 9/8 23/22
25/20 31/6
lot [11]   4/9 5/16 16/14
18/7 19/17 22/20 45/23 47/3
48/8 51/11 60/1
louisiana [13]   1/2 1/14
1/18 1/23 3/24 3/25 3/25
4/18 6/2 37/4 50/1 51/23
56/1
love [1]   56/3
lowest [1]   14/25
LSU [2]   3/16 4/23

**M**

machine [1]   18/6
made [2]   32/20 38/12
mafia [1]   51/23
magic [1]   32/4
magically [1]   32/3
mail [4]   16/6 16/12 42/17
53/18
mailed [1]   20/2
mails [1]   17/9
main [1]   4/4
majored [1]   4/22
majority [2]   12/7 43/3
make [8]   12/17 19/12 34/12
44/14 46/5 48/17 48/23
53/17
makes [1]   48/24
mal [3]   18/4 18/4 18/9
mal-ware [3]   18/4 18/4
18/9
malicious [2]   17/4 18/5
man [1]   60/3
manner [1]   10/25
many [5]   4/12 14/16 36/20
36/25 61/8
market [1]   49/3
marketing [1]   49/2
Martin [3]   44/12 54/6 55/3
MARY [1]   1/12
mass [3]   17/8 42/12 53/3
match [4]   28/14 42/21
52/10 52/20
matches [1]   31/21
materials [1]   7/5
Matt [1]   8/20
matter [2]   36/20 61/17
matters [1]   40/10
may [11]   3/7 6/12 6/14
15/18 24/1 26/17 27/4 27/22
56/22 57/9 58/2
maybe [2]   8/24 24/6
MCLINDON [2]   1/16 1/17
me [60]
mean [30]   8/6 8/18 8/18
9/17 9/17 9/19 12/4 14/5
14/8 17/2 17/12 20/7 23/7
26/15 28/17 32/8 32/12 35/7
36/8 38/19 41/8 45/1 45/16
45/20 45/23 46/1 47/21 53/5
56/4 57/17
Means [1]   8/7
MECHANICAL [1]   1/20
member [3]   58/21 59/17
59/19
memory [5]   37/22 41/19
41/25 43/16 55/9
mention [1]   41/7
mentioned [3]   22/22 29/21
29/22
menu [1]   15/6
met [3]   22/16 22/17 22/20
method [1]   8/13
middle [3]   1/2 1/14 59/20
might [10]   17/22 23/22
24/24 24/25 26/22 27/2 43/3
53/8 57/8 59/21
Millsaps [1]   4/21
mine [1]   42/13
minutes [3]   8/19 35/3 35/4

Case 3:06-cr-00181-FJP-DLD   Document 44   01/16/2009   Page 67 of 73

**M**

Mississippi [1]   4/21
modified [5]   7/13 7/18
  13/21 13/23 22/25
molested [1]   53/6
moment [2]   49/15 56/1
money [3]   42/9 50/1 50/2
monitor [5]   9/10 9/12 9/16
  9/19 10/2
month [1]   40/4
more [11]   9/15 21/3 21/10
  35/4 36/17 36/19 39/10
  48/20 53/18 55/24 57/23
morning [2]   35/4 38/3
most [8]   13/14 16/13 21/17
  24/4 38/14 46/10 49/4 55/6
move [1]   54/23
movie [2]   9/5 12/17
movies [1]   9/7
Mr [4]   3/10 52/2 52/9
  52/11
Mr. [13]   6/9 6/16 8/1
  21/20 21/23 32/22 49/21
  51/8 56/20 58/10 59/8 60/1
  60/8
Mr. Castille [9]   6/9 6/16
  21/20 21/23 32/22 49/21
  56/20 60/1 60/8
Mr. Charles [1]   59/8
Mr. Foti's [1]   51/8
Mr. Leet [1]   8/1
Mr. Plattsmier [1]   58/10
Ms. [1]   20/2
Ms. Jones [1]   20/2
much [5]   7/11 11/12 32/13
  47/17 56/19
multiple [1]   35/19
music [2]   53/4 53/12
must [1]   55/19
my [46]
myself [1]   49/3
mysteriously [1]   32/9

**N**

name [4]   3/11 21/25 22/20
  31/23
named [1]   54/6
names [1]   22/22
narrow [1]   60/23
National [2]   11/6 39/23
nature [1]   35/1
navigate [1]   15/9
necessarily [8]   13/18
  16/15 23/10 24/22 24/23
  26/14 28/17 31/17
need [5]   19/9 50/12 51/12
  58/12 59/22
needed [1]   44/20
needs [2]   16/16 59/6
negative [1]   48/14
never [4]   11/24 14/5 16/6
  16/18
next [3]   15/18 21/16 61/4
night [4]   35/9 39/1 39/2
  50/8
nine [1]   50/8
no [49]
none [1]   47/14
Norton [2]   26/23 31/19

not [95]
Nothing [1]   49/16
notice [6]   10/5 10/7 18/25
  19/7 19/7 19/17
novel [1]   12/3
now [15]   3/14 3/15 8/6
  9/10 28/8 28/20 34/21 39/14
  45/24 46/8 47/3 50/20 59/16
  59/21 60/9
nowadays [1]   48/8
number [3]   6/18 11/4 39/3
numbers [2]   9/25 36/8

**O**

oath [1]   38/6
object [1]   10/4
objected [4]   52/22 52/22
  53/2 53/14
objection [12]   6/11 10/14
  19/1 19/12 32/16 32/18
  32/19 32/20 51/4 51/5 51/17
  54/22
obtain [1]   14/2
occasions [2]   35/19 36/25
occur [1]   46/12
off [13]   13/18 13/22 14/16
  14/17 25/18 27/21 27/24
  36/8 48/17 48/23 57/25 58/3
  59/9
office [25]   1/13 3/21 4/17
  5/20 6/6 11/16 12/25 33/2
  33/8 42/23 44/4 45/12 45/19
  45/24 46/1 46/3 46/9 49/22
  51/25 54/12 56/7 56/10
  56/13 60/6 60/22
officer [1]   20/9
offices [1]   7/2
often [1]   4/10
Oh [2]   43/13 47/23
okay [61]
on [124]
Once [1]   53/11
one [30]   11/4 11/12 11/23
  11/24 12/16 14/1 16/3 16/4
  16/22 20/17 20/19 20/20
  20/21 28/12 29/12 30/11
  33/23 33/25 34/24 35/21
  36/2 36/2 39/22 41/8 46/17
  49/15 50/10 54/18 58/11
  59/18
ones [1]   22/17
online [1]   35/10
only [14]   6/7 10/9 10/14
  15/5 26/11 26/13 26/20
  28/24 35/21 36/2 41/16
  41/16 42/8 60/22
onto [2]   19/4 30/25
oOo [1]   61/14
open [15]   8/12 8/15 9/18
  14/8 14/20 15/9 15/10 15/13
  23/22 23/24 24/2 24/7 25/6
  25/21 26/15
opened [25]   7/20 7/23 8/4
  8/6 8/8 23/6 23/7 24/13
  25/4 26/7 26/8 26/9 26/10
  26/12 26/13 26/13 26/14
  26/14 26/18 26/18 27/13
  27/17 27/18 27/18 27/19
opening [6]   9/17 9/23
  23/12 24/14 26/16 31/25

opens [1]   8/9
operating [1]   15/24
opinion [1]   59/2
opportunity [2]   20/10
  51/13
option [1]   49/10
or [85]
order [3]   14/3 14/18 59/11
originally [1]   4/24
Orleans [1]   51/22
other [19]   4/14 11/24
  16/23 17/5 18/14 20/8 20/19
  20/20 20/21 20/22 21/2
  26/21 27/1 28/1 44/5 45/6
  52/7 58/12 59/21
ought [5]   59/3 59/5 59/8
  60/9 60/12
our [1]   12/18
out [27]   9/4 9/22 10/1
  10/17 10/25 14/18 17/8 35/5
  35/6 35/13 36/18 38/1 38/25
  42/17 43/19 44/19 45/6 45/8
  45/19 46/2 48/15 52/11
  53/17 53/18 56/22 57/3
  59/17
outcome [1]   48/12
Output [1]   13/5
outside [7]   10/7 10/11
  10/19 18/24 19/6 32/20 48/8
over [11]   17/7 21/13 25/18
  27/12 35/1 46/13 46/13
  46/18 46/19 46/20 58/24
overruled [1]   51/17
overtime [3]   35/6 35/14
  36/18
overwrite [1]   11/10
overwritten [1]   12/24
own [1]   13/3

**P**

p.m [1]   39/2
page [2]   2/2 18/7
paid [5]   6/7 34/25 42/9
  47/17 52/13
paperback [1]   12/3
parents [1]   5/21
Parish [2]   4/17 51/22
part [8]   4/17 13/14 30/1
  38/14 41/8 44/5 44/10 56/4
particular [6]   7/24 17/18
  23/8 23/23 38/14 38/20
particularly [1]   57/12
past [1]   35/5
PATRICIA [1]   1/12
pay [8]   41/9 41/10 44/14
  44/15 44/18 44/21 50/2 54/2
payload [1]   30/6
people [9]   14/8 16/13 17/7
  17/10 17/19 42/12 44/1
  44/14 47/4
per [1]   29/13
per se [1]   29/13
percent [1]   42/9
period [2]   12/12 21/13
permitted [1]   40/20
person [7]   7/20 16/5 16/25
  19/3 21/7 27/18 55/5
person's [4]   18/10 19/4
  20/6 21/8
personal [2]   28/20 46/2

**P**

photograph [2]   52/4 52/13
phrase [1]   36/11
picked [2]   30/18 55/8
picture [1]   9/20
pictures [5]   8/17 9/7
  14/23 15/16 52/11
Piker [2]   46/10 46/25
place [2]   11/14 12/6
PLAINTIFF [1]   1/4
plan [1]   59/23
Plattsmier [4]   57/13 57/22
  58/10 59/8
playing [1]   31/5
please [3]   3/11 56/22 61/3
plug [2]   12/6 12/10
plugged [1]   4/9
plugging [1]   11/25
podium [2]   19/13 19/14
point [9]   10/3 16/3 24/14
  29/12 39/18 46/17 53/9 60/4
  60/5
pointing [1]   45/8
points [3]   46/18 46/19
  46/19
policy [1]   35/3
political [2]   43/20 44/8
POLOZOLA [1]   1/8
pop [1]   23/10
porn [4]   9/9 32/9 50/3
  50/5
pornography [9]   6/6 19/4
  20/5 21/7 30/25 31/2 32/2
  37/12 52/17
positive [1]   48/14
positively [1]   48/12
possible [6]   18/8 18/21
  27/7 27/9 27/10 30/17
possibly [2]   26/3 43/20
potentially [1]   11/10
Pou [1]   51/3
power [1]   21/12
powered [2]   21/11 21/16
powering [1]   31/25
present [3]   3/2 19/13
  34/15
presentations [2]   5/18
  5/21
preserve [1]   11/8
President [1]   59/7
pretty [3]   7/11 11/12
  45/21
prevents [1]   12/22
preview [1]   23/19
previewing [1]   26/20
primarily [4]   4/3 6/1 6/8
  53/24
priority [1]   53/7
Prison [1]   51/22
probably [5]   9/8 17/13
  21/14 21/14 21/16
problem [2]   10/14 56/8
problems [3]   17/4 18/19
  55/19
procedures [1]   58/9
proceed [2]   3/7 6/14
proceedings [1]   1/20 61/17
produced [2]   1/20 6/19
producing [2]   42/12 53/4

profession [2]   58/4 58/4
Professional [1]   57/7
professionally [1]   48/23
program [22]   7/21 8/7 8/13
  16/21 16/25 17/3 17/4 17/5
  17/12 18/5 18/5 18/9 23/8
  23/14 24/21 26/4 26/15
  26/16 26/22 27/18 30/4
  30/19
programs [5]   17/3 23/7
  26/22 27/1 27/4
promoter [4]   42/23 51/21
  52/5 52/8
proper [1]   11/1
properly [2]   10/2 59/10
prosecute [2]   50/2 50/4
prosecuted [1]   51/2
prosecution [1]   5/11
prosecutor [1]   56/5
protect [2]   5/23 43/1
provided [7]   6/16 6/25 7/5
  19/7 19/17 19/21 19/22
providing [1]   10/6
pull [4]   20/15 20/16 20/19
  20/20
pulled [2]   6/20 13/15
purposes [1]   28/6
put [13]   20/5 20/11 21/1
  24/10 34/23 35/15 35/23
  40/9 47/9 47/13 50/15 59/11
  60/19

**Q**

qualified [2]   5/8 55/13
question [10]   15/18 24/5
  25/9 31/4 34/13 34/20 37/23
  39/6 40/19 40/22
questioning [1]   19/8
questions [11]   3/13 10/9
  21/3 22/1 37/17 39/11 40/9
  51/11 51/13 60/2 60/11
quickly [1]   15/3

**R**

RAINER [1]   1/17
Rapido [9]   15/1 15/10
  15/10 15/11 28/25 29/7 29/7
  29/11 29/17
Rapido\My [1]   29/1
rare [2]   35/11 38/15
RDR [1]   1/21
read [4]   12/11 20/17 20/24
  28/12
ready [2]   61/4 61/9
real [5]   33/18 39/4 53/6
  57/11 58/25
realize [1]   58/16
really [2]   47/14 53/7
reason [11]   16/7 16/14
  30/1 33/12 33/18 34/10
  36/24 39/4 42/5 45/4 56/5
reasons [4]   43/20 44/8
  45/6 60/17
recall [10]   37/3 37/17
  37/20 40/18 40/22 41/12
  41/14 43/14 43/21 46/15
receive [2]   16/6 16/12
received [2]   6/18 6/19
recently [4]   3/15 3/16
  17/21 17/21

record [3]   3/10 44/23
  61/17
RECORDED [1]   1/20
red [2]   35/13 36/13
redirect [2]   49/17 49/19
Reeves [2]   46/11 53/24
referring [2]   24/3 38/19
reflect [2]   39/2 48/12
refresh [5]   37/22 41/19
  41/25 43/16 55/9
regarding [3]   20/4 57/5
  58/9
regular [3]   11/22 15/12
  16/25
relate [1]   42/20
related [2]   5/17 42/11
relevant [1]   54/21
rely [1]   28/9
remember [4]   7/7 7/25 37/6
  38/6
remembered [1]   38/4
remembers [1]   29/14
remote [4]   18/11 18/21
  19/3 21/7
remove [2]   30/2 44/23
removed [1]   51/6
repairman [2]   27/4 27/10
repeatedly [2]   33/22 33/23
rephrase [1]   32/19
replicates [1]   16/22
report [9]   19/19 19/20
  45/10 45/12 57/10 57/14
  57/18 59/4 59/4
reported [2]   1/21 57/8
REPORTER'S [1]   61/15
reports [3]   14/1 28/12
  28/15
requested [2]   48/2 61/13
require [1]   40/12
requirement [2]   16/9 16/11
research [2]   31/10 31/12
researched [2]   30/13 31/16
researching [1]   31/17
reserve [1]   4/16
reset [1]   21/16
residence [1]   12/9
resign [2]   40/20 44/24
resigned [1]   42/15
response [1]   37/23
responsibility [2]   57/7
  59/17
result [1]   42/16
review [1]   20/10
reviewed [3]   7/4 55/7 55/9
Richard [3]   37/7 50/23
  50/24
right [27]   3/14 3/15 6/12
  12/14 15/7 18/17 27/16 28/3
  40/16 40/24 41/4 46/6 48/4
  49/22 50/16 50/22 53/1
  53/25 54/2 54/9 54/10 55/25
  56/17 59/23 60/21 60/22
  61/2
rival [1]   52/5
root [2]   14/24 14/25
rouge [6]   1/15 1/18 1/23
  4/17 4/24 55/11
roughly [1]   9/4
row [1]   52/9
ruined [1]   53/8

**R**

rule [3]  11/4 11/12 19/23
ruled [2]  32/18 51/16
run [4]  17/2 18/6 50/24
51/21
running [4]  16/10 26/22
27/1 31/5
runs [1]  17/5

**S**

said [24]  12/19 14/1 21/3
23/3 26/5 26/8 26/9 28/12
30/22 34/21 36/2 38/24
40/24 41/14 42/5 42/13
44/25 50/2 50/11 50/15
52/16 56/15 59/12 60/6
salaried [3]  34/25 36/20
50/13
salary [6]  6/7 42/9 49/24
50/5 50/8 50/11
same [8]  9/8 13/22 15/12
30/4 31/22 43/6 50/8 51/2
sat [3]  9/6 21/10 52/9
save [3]  13/11 29/12 29/14
saved [3]  13/24 24/12
29/15
saves [1]  13/12
saw [2]  16/18 31/13
say [26]  3/10 8/14 19/12
23/4 23/5 23/24 25/8 25/14
25/20 25/20 26/5 26/11
27/14 27/17 27/17 27/23
28/6 28/7 31/25 40/13 43/23
45/22 59/6 59/16 59/25
60/11
saying [8]  28/8 42/17
48/16 58/20 60/4 60/8 60/8
60/25
says [1]  15/21
scan [2]  23/8 27/11
scanned [1]  27/7
scene [4]  11/18 11/19 12/5
12/12
school [15]  3/15 3/16 3/19
3/20 4/23 5/1 39/14 43/20
44/6 44/8 44/10 44/25 45/7
56/5 58/6
schools [1]  5/21
science [2]  4/22 5/17
science-related [1]  5/17
scope [5]  10/7 18/24 19/6
32/20 39/5
screen [6]  9/24 23/10 24/1
25/19 25/22 26/17
scroll [3]  12/15 12/16
14/11
se [1]  29/13
search [9]  4/6 10/22 10/25
11/15 11/18 12/5 12/19 18/2
55/5
searches [1]  12/7
second [4]  34/3 56/22
56/24 57/2
seconds [1]  8/15
secured [1]  12/9
see [9]  9/18 9/19 9/25
10/2 13/8 14/9 20/21 31/6
53/7
seemed [4]  9/7 10/16 36/5

44/1
seems [1]  49/4
seen [1]  14/8
seize [1]  4/7
self [5]  57/10 57/14 57/18
59/4 59/4
self-report [5]  57/10
57/14 57/18 59/4 59/4
selling [2]  42/12 53/4
seminars [3]  5/15 5/16
5/18
send [4]  16/5 16/12 17/8
57/19
sense [2]  24/14 26/14
sent [4]  18/10 20/1 42/17
53/18
September [7]  7/7 7/22
7/25 10/23 14/19 27/13 28/2
September 20 [1]  10/23
September 4 [4]  7/7 7/22
7/25 27/13
September 4th [1]  28/2
September 4th at [1]  14/19
series [4]  23/22 24/5
25/17 25/19
serious [2]  40/7 40/10
serve [1]  4/14
set [11]  11/23 13/12 14/14
14/15 17/9 21/18 27/16
27/24 29/10 29/13 37/1
sets [2]  7/16 13/6
settings [1]  27/11
several [2]  51/23 53/5
sexual [2]  37/14 48/9
share [1]  20/22
she [2]  6/23 6/23
sheet [5]  36/4 36/9 38/23
42/4 43/3
sheets [11]  33/11 33/14
33/22 34/2 34/6 34/14 37/18
38/10 46/6 46/7 50/12
shelf [1]  21/10
sheriff [1]  4/16
Sheriff's [1]  4/17
short [1]  61/7
shortcut [3]  28/21 28/24
28/25
should [4]  31/25 57/8
57/13 60/17
shouldn't [1]  9/15
show [1]  51/10
showed [1]  37/24
shut [1]  17/10
sign [6]  38/2 38/5 38/11
38/22 38/25 38/25
signature [1]  31/21
signed [1]  38/1
significant [3]  7/8 30/23
36/6
signing [1]  37/25
simple [1]  11/9
single [1]  25/4
sir [11]  3/7 6/14 10/10
10/15 10/18 19/15 32/21
32/25 33/3 49/18 57/5
sit [1]  8/18
sites [4]  17/10 17/22
17/22 21/1
sitting [1]  14/6
size [1]  9/24

sizes [1]  10/1
sleeping [2]  44/15 44/15
slip [2]  35/5 35/6
slips [4]  35/13 35/14
36/18 36/19
smaller [1]  12/3
so [65]
software [2]  11/7 55/8
some [21]  4/18 5/25 13/2
15/17 16/24 17/14 18/8
31/22 37/15 44/1 45/14 46/7
46/18 46/18 46/19 50/1
51/13 53/6 55/7 55/8 55/9
somebody [3]  29/10 44/19
58/23
somehow [2]  27/22 38/10
someone [2]  9/6 18/21
something [18]  8/15 12/18
14/6 14/18 17/13 18/1 22/6
23/3 25/8 29/12 29/14 29/15
41/17 57/8 57/9 59/9 59/16
59/25
sometime [1]  46/13
sometimes [3]  23/6 24/21
38/2
somewhere [2]  3/15 50/10
sorry [5]  7/23 30/16 36/16
43/13 54/19
sort [5]  18/8 19/18 25/17
42/13 45/25
sounds [1]  45/21
space [1]  41/11
speak [1]  30/6
special [5]  4/19 22/19
22/19 32/1 33/7
specifically [3]  20/25
31/4 52/16
specified [2]  6/7 42/7
spell [1]  3/10
spoil [1]  12/20
spoils [1]  11/10
spoken [1]  5/25
spreads [1]  16/22
standard [1]  15/23
stands [1]  13/5
start [8]  3/14 15/6 15/7
25/18 49/21 58/7 59/9 60/24
started [6]  27/4 35/20
42/10 42/10 52/25 53/2
starting [2]  57/25 58/3
state [11]  3/24 3/25 5/7
5/24 35/11 40/16 49/22 50/1
55/11 55/23 59/7
statement [1]  58/24
states [9]  1/1 1/3 1/9
1/12 1/13 1/22 21/25 49/6
49/12
stay [2]  32/19 32/23
stayed [1]  35/5
stealing [1]  46/4
STENOGRAPHY [1]  1/20
step [2]  56/21 56/22
Steve [4]  44/12 54/6 55/3
55/10
still [7]  26/17 30/4 54/12
54/20 56/2 56/6 56/13
store [1]  27/5
stored [2]  21/15 24/21
storing [1]  21/2
straight [4]  46/5 60/10

**S**

straight... [2]  60/13
60/17
street [1]  1/14 1/23
strictly [1]  16/5
student [1]  31/22
studied [1]  60/14
study [1]  58/5
studying [1]  60/13
stuff [4]  4/4 6/4 35/10
60/19
submit [7]  39/21 39/23
40/2 40/3 40/6 57/22 60/9
submitted [3]  43/7 57/6
60/24
submitting [1]  40/2
such [5]  9/24 24/4 35/7
suddenly [1]  24/11
suggesting [4]  27/21 38/10
44/7 60/16
suggests [1]  9/6
SUITE [2]  1/14 1/17
summary [5]  19/10 19/21
19/24 20/1 20/3
supervised [1]  47/14
supervisor [6]  41/21 43/19
46/9 46/16 46/22 47/9
supervisors [3]  46/22 47/7
50/11
supposed [2]  17/6 42/14
Supreme [1]  58/11
sure [10]  6/22 12/17 29/3
34/12 44/14 46/5 47/9 47/14
48/5 59/20
surprise [1]  31/1
surveillance [2]  42/21
52/4
suspect [1]  45/4
suspended [16]  33/8 33/13
33/19 33/21 39/12 40/20
41/6 41/9 41/10 41/23 42/15
43/2 44/11 44/18 51/12 54/2
suspension [5]  39/11 44/23
46/23 47/1 47/8
sustain [1]  54/22
sustained [3]  19/1 32/17
51/5
sworn [2]  3/5 30/21
system [2]  13/5 15/24

**T**

take [5]  3/18 8/11 12/6
17/7 57/1
taken [1]  3/17
takes [2]  12/12 58/4
taking [1]  52/10
talked [7]  6/23 26/23
27/20 32/11 32/11 32/14
44/1
talking [8]  22/4 36/3 59/1
59/2 59/3 60/5 60/6 60/19
tape [2]  35/13 36/13
Task [1]  3/22
taught [1]  5/23
teachers [1]  5/21
teaches [1]  11/13
teaching [1]  6/3
tech [1]  3/21
technical [2]  4/9 6/4

technician [1]  8/21
Tedder [1]  22/19
tell [16]  3/14 6/16 10/14
11/3 11/8 13/3 14/22 15/3
16/20 17/17 23/8 27/11
46/21 51/19 59/10 59/19
telling [3]  53/18 58/18
ten [2]  8/24 57/21
tend [1]  17/25
tender [1]  6/9
tendered [1]  6/13
term [1]  18/5
terminated [3]  40/20 41/1
41/23
termination [2]  40/21
41/20
terms [3]  41/22 42/15
42/24
Terri [2]  22/19 22/20
terrified [1]  45/25
test [2]  9/22 10/1
testified [15]  3/6 5/3
5/11 5/13 8/21 8/23 22/14
22/17 22/18 27/12 35/21
48/16 48/22 49/12 55/10
testify [11]  6/23 10/8
10/20 32/22 42/3 48/15
55/25 56/2 56/3 56/4 56/11
testifying [8]  37/3 37/6
37/9 38/6 44/4 48/9 49/6
56/8
testimony [19]  1/7 3/1
6/13 9/10 9/12 10/6 13/2
17/14 18/24 19/16 19/21
20/4 28/1 28/6 30/21 32/23
36/24 55/22 57/11
Texas [2]  6/2 55/24
than [8]  12/3 15/21 35/4
36/18 36/19 38/16 53/7
57/23
Thank [2]  21/20 56/19
that [371]
that's [49]
their [8]  3/21 5/23 14/8
14/13 18/6 21/18 30/2 43/1
them [31]
then [35]
there [48]
there's [9]  3/23 9/20
10/13 10/14 15/20 16/14
21/12 30/11 41/11
these [7]  5/25 14/22 25/21
31/16 32/12 36/25 36/25
they [102]
they're [1]  17/20
thing [12]  4/5 4/8 11/7
22/8 31/22 34/2 34/5 34/25
40/7 41/8 42/13 43/3
things [15]  12/16 16/24
18/8 21/2 23/11 23/14 26/21
42/11 42/20 45/5 45/25 46/2
46/4 58/20 59/12
think [25]  9/8 15/19 22/17
24/14 25/18 32/6 32/7 32/8
36/5 38/19 39/5 47/11 48/19
48/20 48/22 48/24 51/9
51/12 52/10 57/12 57/13
58/12 59/3 59/6 60/8
thinks [1]  17/5
third [2]  17/11 18/10

this [52]
thorough [1]  22/8
those [14]  8/7 8/17 13/15
14/15 15/16 23/14 25/22
28/5 28/10 28/14 40/10 45/5
48/12 53/10
though [8]  7/2 10/16 29/5
31/8 31/22 45/21 46/6 50/11
thought [3]  8/23 10/19
39/25
thousands [1]  16/15
threatened [1]  46/3
three [3]  7/12 49/14 58/5
through [8]  9/6 9/8 12/15
12/16 18/23 55/8 58/5 60/15
throughout [1]  55/22
throw [1]  45/6
thumbnail [7]  24/7 24/18
24/20 24/22 25/4 25/24
25/25
thumbnails [15]  23/17
23/19 23/23 24/1 24/2 24/4
24/6 24/10 24/12 24/13
25/17 25/19 25/22 26/4
26/20
ties [1]  51/23
time [57]
times [7]  13/6 26/6 28/17
37/25 39/18 49/14 51/23
tiny [1]  12/4
title [1]  4/18
Toby [1]  46/18
today [12]  22/1 22/18
36/24 38/16 54/8 56/15
57/11 58/17 58/25 59/2
59/12 59/20
told [17]  8/2 33/13 33/21
35/23 39/25 42/2 43/16 44/6
44/11 44/22 44/24 46/18
46/19 46/20 50/13 52/7
53/16
tonight [2]  61/10 61/11
too [1]  37/12
took [4]  6/24 46/2 46/13
46/13
topics [1]  5/17
track [2]  13/4 25/18
tracks [2]  36/7 36/10
training [2]  5/16 11/5
transcript [7]  1/7 1/20
57/14 57/22 59/11 61/13
61/16
traveling [1]  35/11
trial [6]  1/8 19/12 37/18
38/17 55/6 55/10
tried [3]  20/11 41/15
44/18
TROY [1]  1/19
true [8]  13/22 29/7 34/14
34/18 35/22 38/13 48/19
56/16
trumped [1]  45/14
truth [1]  59/10
truthfully [1]  48/15
trying [6]  34/21 36/7
36/10 36/12 49/3 58/21
turn [2]  9/20 15/20
turned [1]  9/12
turning [1]  11/9
TV [1]  9/20

**T**

**two [15]** 4/13 14/10 14/10 20/22 21/10 21/13 33/5 39/18 39/21 39/24 53/20 60/9 60/16 60/17 60/23
**two-year [1]** 21/13
**type [5]** 4/8 18/1 38/3 41/15 44/2
**typed [1]** 58/17
**types [2]** 10/6 53/10
**typically [4]** 13/12 16/22 31/19 35/8

**U**

**U.S [1]** 56/7
**Uh [18]** 13/1 17/16 18/12 22/24 23/2 40/17 40/17 40/23 41/2 41/5 41/24 49/23 50/6 50/14 50/19 51/1 54/11 54/17
**Uh-huh [18]** 13/1 17/16 18/12 22/24 23/2 40/17 40/17 40/23 41/2 41/5 41/24 49/23 50/6 50/14 50/19 51/1 54/11 54/17
**ultimately [2]** 34/2 34/5
**Um [6]** 4/16 6/18 14/1 30/1 34/17 46/17
**unable [1]** 14/1
**under [5]** 15/17 19/23 38/6 45/8 47/24
**undercover [1]** 35/10
**undergrad [1]** 4/22
**understand [2]** 6/4 16/10
**understanding [1]** 47/21
**unencoded [1]** 31/11
**unit [1]** 3/21
**united [9]** 1/1 1/3 1/9 1/12 1/13 1/22 21/25 49/6 49/12
**unless [3]** 51/10 57/14 58/13
**unlikely [1]** 27/7
**unnecessary [1]** 36/13
**unplug [1]** 12/10
**until [5]** 35/9 35/20 38/25 39/2 58/17
**up [32]**
**update [2]** 20/2 20/2
**us [11]** 6/16 11/3 16/20 17/17 42/2 42/10 42/19 52/8 53/3 53/18 53/20
**use [11]** 11/24 17/10 17/11 17/19 20/25 50/2 52/13 52/16 52/20 53/11 56/4
**used [5]** 8/7 16/5 20/5 23/6 51/21
**user [6]** 8/7 8/16 16/16 17/22 18/5 26/18
**Users [1]** 15/8
**uses [1]** 17/24
**using [4]** 7/20 8/13 8/14 16/25

**V**

**variance [5]** 34/6 34/8 36/4 36/5 39/3
**various [3]** 4/9 5/24 31/19
**vast [1]** 12/7

**very [8]** 22/9 30/3 43/6 56/19 58/8 60/14 60/22 61/7
**victims [1]** 53/6
**video [3]** 9/11 9/22 10/1
**view [6]** 8/9 8/14 23/10 24/22 26/15 26/18
**violate [1]** 41/22
**violating [2]** 42/24 45/9
**violation [1]** 57/8
**virus [24]** 16/20 16/21 17/1 17/3 17/13 18/8 18/10 18/16 18/20 18/24 30/3 30/4 30/5 30/7 31/2 31/5 31/5 31/6 31/20 31/20 31/23 31/24 31/24 32/9
**viruses [21]** 16/24 17/7 18/3 18/4 18/13 19/16 20/5 21/1 21/4 29/21 29/22 30/2 30/10 30/18 30/22 31/8 31/12 31/13 31/16 32/11 32/13
**vote [1]** 59/20
**voted [1]** 45/19

**W**

**wait [11]** 7/23 20/18 20/18 30/14 30/14 30/14 34/4 34/4 34/4 47/23 54/18
**wall [1]** 4/10
**want [16]** 8/18 14/9 17/22 18/1 35/12 45/6 45/20 56/25 59/11 61/9 61/9
**wanted [4]** 35/4 42/25 52/11 56/5
**wants [2]** 60/11 60/19
**ware [4]** 18/4 18/4 18/4 18/9
**warrant [4]** 10/22 11/1 12/19 55/5
**warrants [2]** 4/6 11/15
**was [164]**
**wasn't [12]** 8/3 9/11 14/2 22/10 32/10 35/1 37/12 42/18 47/2 47/9 47/14 58/16
**watched [1]** 52/10
**way [12]** 12/20 15/5 18/2 24/7 26/18 32/8 36/11 51/5 51/5 58/7 58/12 60/24
**ways [1]** 24/20
**we [35]**
**we'll [3]** 25/17 34/3 39/6
**we're [6]** 10/6 15/19 19/18 22/4 42/14 51/9
**we've [3]** 13/2 19/17 61/1
**web [6]** 17/10 17/18 17/19 17/22 17/22 21/1
**week [7]** 14/9 36/19 38/14 38/20 38/21 42/19 53/20
**weekend [1]** 55/6
**weekly [1]** 46/17
**well [39]**
**went [15]** 3/19 3/20 4/6 4/21 4/22 8/8 28/25 29/1 38/12 38/22 39/1 42/13 55/7 55/11 56/5
**were [100]**
**weren't [3]** 14/6 33/9 53/19
**Western [2]** 5/6 58/24
**what [62]**

**whatever [14]** 6/18 7/16 7/21 9/22 11/7 11/24 12/15 12/18 17/11 45/14 52/9 59/10 59/23 60/10
**whatnot [1]** 5/22
**when [46]**
**whenever [3]** 4/7 7/18 13/8
**where [11]** 4/20 5/1 12/5 14/8 14/19 14/22 15/14 15/16 23/10 29/15 48/22
**WHEREUPON [1]** 3/5
**whether [10]** 7/20 11/6 27/18 32/12 32/13 40/15 48/21 58/10 58/14 60/21
**which [9]** 9/6 10/25 15/6 15/12 15/24 18/24 21/17 42/25 43/3
**while [5]** 33/8 41/10 44/11 44/18 50/18
**whistle [1]** 44/2
**White [1]** 11/6
**who [14]** 14/20 46/9 46/16 47/9 47/15 50/22 51/8 51/8 51/21 52/11 53/23 53/23 55/1 55/5
**whoever [1]** 8/16
**whose [1]** 53/8
**why [8]** 34/8 34/10 38/9 42/2 42/6 43/17 44/2 54/21
**will [16]** 8/9 9/25 10/6 13/11 14/8 14/9 14/11 14/11 14/12 14/12 17/20 20/7 20/17 23/9 31/19 61/7
**willing [1]** 56/2
**wind [1]** 17/25
**Windows [5]** 15/5 15/7 15/23 24/22 29/16
**within [9]** 9/24 15/1 15/11 24/21 31/6 32/19 32/23 53/20 57/21
**without [3]** 11/14 11/25 21/11 31/5 41/9 41/9 44/18 44/21 54/2
**witness [6]** 6/13 10/6 19/16 61/4 61/7 61/9
**witnesses [2]** 22/15 61/8
**won't [4]** 10/12 21/3 23/10 57/1
**word [2]** 21/1 23/6
**words [1]** 13/3
**work [28]** 4/3 4/10 6/5 6/8 9/10 11/24 27/5 35/7 37/24 38/10 38/24 41/9 42/8 42/11 42/18 42/19 44/11 44/19 45/23 53/3 53/10 53/18 53/20 54/6 55/2 55/3 55/4 55/6
**worked [12]** 3/20 9/13 33/2 34/23 34/24 35/12 35/17 38/15 38/25 47/3 50/7 50/7
**working [18]** 9/11 9/16 9/19 9/21 10/2 14/2 14/3 30/23 33/9 36/19 37/1 42/7 42/14 44/12 44/17 46/8 49/21 51/24
**would [62]**
**wouldn't [11]** 24/13 24/23 30/23 30/24 32/6 32/7 36/11 48/17 52/8 56/8 59/16
**write [10]** 11/14 11/21

Case 3:06-cr-00181-FJP-DLD    Document 44    01/16/2009    Page 72 of 73

## W

write... [8] 11/23 11/25
12/2 12/8 12/10 12/22 12/25
59/11
writes [1] 11/9
writing [1] 43/4
written [1] 12/23
wrong [9] 11/3 13/17 13/18
13/19 57/25 58/3 58/19
60/21 60/22
wrote [3] 34/17 34/19
41/19

## Y

year [1] 21/13
years [6] 4/12 14/10 14/10
21/10 33/5 58/5
yes [107]
yesterday [1] 31/14
yet [2] 3/17 3/18
you [342]
you're [25] 3/14 4/24 8/13
8/14 20/8 25/20 27/20 28/8
39/14 40/15 44/15 46/8
48/16 49/1 49/6 49/9 50/11
55/1 57/25 58/3 58/7 58/7
58/20 58/20 59/18
you've [5] 25/21 39/16
39/18 58/18 60/14
your [77]
yours [3] 54/14 54/16
54/20
yourself [3] 49/2 57/15
57/18

## Z

zombie [1] 17/9